# United States Court of Appeals
## For the First Circuit

No. 19-2167

SHAEL NORRIS, on behalf of her minor child A.M.,

Plaintiff, Appellee,

v.

CAPE ELIZABETH SCHOOL DISTRICT; DONNA WOLFROM, Superintendent of Cape Elizabeth Schools; JEFFREY SHEDD, Principal of Cape Elizabeth High School; NATHAN CARPENTER, Vice Principal of Cape Elizabeth High School,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Melissa A. Hewey, Bruce W. Smith, Amy K. Olfene, Jeana M. McCormick, and Drummond Woodsum on brief, for appellants.
Emma E. Bond, Zachary L. Heiden, and the American Civil Liberties Union of Maine Foundation on brief, for appellee.
Scott H. Harris, Christina M. Denbow, McLane Middleton, Professional Association, Nicole J. Ligon, H. Jefferson Powell, and Ian C. Kalish on brief for Ana Goble and First Amendment Clinic at Duke Law School, amicus curiae.
James B. Haddow, Petruccelli, Martin & Haddow LLP, Jennifer Nelson, Gabriel Rottman, and The University of Virginia School of Law First Amendment Clinic on brief for the Maine Press Association, amicus curiae.

Peter Mancuso, Andrew Schmidt Law PLLC, and Diane L. Rosenfeld on brief for the Gender Violence Legal Policy Workshop at Harvard Law School, amicus curiae.

—————————————

August 6, 2020

—————————————

LYNCH, **Circuit Judge**.  The defendants in this case are Maine's Cape Elizabeth School District and officials of Cape Elizabeth High School.  They appeal from the entry of a preliminary injunction prohibiting them from suspending A.M., a sophomore student at Cape Elizabeth High School at the time this suit was filed.  They seek to suspend A.M. because on September 16, 2019, she anonymously posted a sticky note on a mirror in a Cape Elizabeth High School girls' bathroom that stated "THERE'S A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS."  The defendants investigated the note after another student brought it to them promptly and they concluded that it constituted bullying under the school's policies, which warranted imposing a three-day suspension on A.M.

A.M., through her mother Shael Norris, filed a complaint requesting that the district court enjoin the defendants from suspending her on the grounds that (1) the suspension violated her "right to free expression under the First Amendment to the U.S. Constitution, as applied to the states by the Fourteenth Amendment and 42 U.S.C. § 1983"; and (2) the defendants violated Title IX of the Education Amendments of 1972 by retaliating against her for making a complaint.  A.M. also moved for a preliminary injunction, which the district court granted based on A.M.'s First Amendment claim.  A.M. ex rel. Norris v. Cape Elizabeth Sch. Dist., 422 F. Supp. 3d 353, 358 (D. Me. 2019).

- 3 -

We do not endorse the district court's precise reasoning, but for the reasons described below, we hold the district court did not abuse its discretion in granting the preliminary injunction.

I.

We describe the facts as alleged in the complaint and supported by the evidence at the preliminary injunction hearing. At the time this suit was filed, A.M. was a fifteen-year-old sophomore at Cape Elizabeth High School ("Cape Elizabeth H.S." or "the school"). The defendants are Cape Elizabeth School District, Superintendent of Cape Elizabeth Schools Donna Wolfrom, Principal of Cape Elizabeth H.S. Jeffrey Shedd, and Vice Principal of Cape Elizabeth H.S. Nathan Carpenter.

A.   Facts

On September 16, 2019, A.M. placed a sticky note on a mirror in a second-floor Cape Elizabeth H.S. girls' bathroom that read "THERE'S A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS." The sticky note was unsigned. The note did not identify who committed the "rape" or the gender of the "rapist." It also did not state where or when the "rape" occurred. It did not identify who the "YOU" was or the purported basis of the knowledge of that "YOU."[1]

_____

[1]    Although this specific allegation had not been brought to the school administration, for more than a year prior to posting the sticky note, A.M. had been attempting "to raise [her] concerns about the school's [sexual assault] reporting procedures through

- 4 -

Another student found the note a few minutes later and arranged for a different student to bring it to the school administration. That same day, two other female students posted sticky notes in another bathroom at the school. One of the other notes stated that the school should "kick out the rapist," and another stated that the administration "is protecting him."[2]

Shedd and Carpenter initiated an investigation into all of the sticky notes' allegations, not just the sticky note authored

_____

official channels." On June 11, 2019, A.M. and two of her peers attended a Cape Elizabeth public school board meeting during which they raised concerns about the school's Title IX procedures and its inadequate handling of sexual violence. At least one of the students who accompanied A.M. is a survivor of sexual assault, and the school was aware of this because she had filed a Title IX complaint a year earlier which had been substantiated and had resulted in a finding that another student had violated school policy. At the school board meeting, A.M. specifically complained that the school district had no policy describing how to report sexual assault nor did it outline the rights of students regarding sexual assault reporting in the Student Handbook. She requested the school board work with her and her fellow students on a comprehensive policy that would better protect students. She further asked that the school board provide trainings to staff about the importance of mandatory reporting and do more to support students who report sexual assaults. The other students who spoke also complained about the school's treatment of students who report sexual assault and its failure to comply with mandatory reporting under Title IX. The administrators assert that after the meeting, a school committee "embarked on a comprehensive . . . review of [the school's] policies and procedures." The committee appointed a student representative but did not invite any of the students who had requested to be involved.

[2]     The record is not clear as to how many sticky notes in total were posted or what message was stated on each sticky note posted by these other female students. The parties both agree that A.M. only authored one sticky note.

- 5 -

by A.M., as well as into the identities of the authors. They treated the notes as complaints under Title IX. Over the course of ten days, they interviewed forty-seven students about the notes, including A.M., and reviewed security camera footage from inside the school. The sticky notes caused "alarm" and "fear" among some students at the school. In her first interview on September 16, A.M. did not disclose that she was the author of the first note.

Through the investigation, the school authorities say they came to believe that the sticky notes referenced a particular male student, "Student 1." The investigation uncovered that there had been earlier rumors among some members of the student body that Student 1 had committed sexual assault. The most widespread rumor centered around a video that had been circulated on social media allegedly depicting Student 1 about to commit sexual assault.[3] The evidence shows that the video was made and circulated months before A.M. posted the note and that the rumors were circulating before A.M.'s note was posted. Some of the students had only heard about the video and had not seen it themselves. Some but not all of the students who had seen the video described it as a joke. The school administrators eventually obtained a copy of the video and viewed it. It did not depict Student 1 about

---

[3] According to the rumors, the video depicted Student 1 dragging an intoxicated female by her hair into a bathroom where he later sexually assaulted her.

to commit sexual assault, or sexual assault at all.[4]  The defendants do not assert that A.M. was the source of the rumors, nor do they assert that A.M. was responsible for the video.[5]

On September 17, 2019, Student 1 experienced ostracism from his peers and stayed out of school for the following seven or eight days.  The school does not allege that A.M. was one of the students who ostracized Student 1.  Student 1's mother informed the school that she believed Student 1's treatment at school had been caused by the sticky notes and that this treatment constituted bullying.  She also expressed particular concern about learning who captioned the video that had been circulated among the students.

---

[4]    The video showed Student 1 picking up a female who did not attend Cape Elizabeth H.S. from a bed.  The video had a caption that stated, "this is Student 1 raping bitches."  School administrators interviewed the female in the video, who told them that Student 1 picked her up in order to convince her to go outside to her car to retrieve her vaping device.  She told them that she, Student 1, another female, and two other male Cape Elizabeth H.S. students had been celebrating a birthday at a hotel room, which is where the video was filmed.  She told the administrators that Student 1 did not rape her.

[5]    During the investigation, school administrators also interviewed a female Cape Elizabeth H.S. student who had a protection order in place against Student 1 stemming from an off-campus incident that occurred in the spring of 2019.  The female student told them that she did not wish for any further action to be taken.  We note that victims of any sexual assault crime under Maine statutory law may file a complaint for a protective order against the perpetrator, after which they must prove the allegation by a preponderance of the evidence at a hearing.  Me. Rev. Stat. Ann. tit. 19-A, §§ 4005(1), 4006(1).

Also on September 17, 2019, school administrators interviewed A.M. for the second time. After being confronted with video evidence of her entering the bathroom around the time the first note was posted, A.M. admitted writing and posting the first note. The statements made by A.M. and the defendants during this interview are disputed. The defendants assert that during this interview, A.M. stated that her purpose for posting the note was to "instill[] fear in the school community and to alert the school community because she felt the [s]chool was not taking allegations of sexual assault seriously." They further state that A.M. specifically identified Student 1 as her note's target, described "incidents of alleged rape that [she] believed (without personal knowledge) that he was involved in," and "complained [he] was 'idolized' by the High School faculty."

A.M. denies making these statements and denies that Student 1 was her note's intended target. She states that the administrators repeatedly asked her to disclose the names of any perpetrators and victims of sexual assaults of which she was aware. She responded by describing two different incidents. The first one involved the video of Student 1, which she claims she only learned of after posting the note. The second incident involved a different student who had been accused of committing sexual assault. That student had been involved in a Title IX investigation conducted in the spring of 2019 which had

- 8 -

substantiated the allegation of sexual assault. A.M. asserts the administrators told her that they were aware of the incidents that she had described and that they did not constitute "rape."

A.M. states that she "explained repeatedly" to the administrators that she "posted the note to address the problem of sexual assault in [the] school and because of concerns with the school's handling of sexual assault claims." A.M. further states that she did not intend to direct the term "rapist" in the note at any specific person; rather, she believes there are multiple people who have committed sexual assault at Cape Elizabeth H.S. She denies even knowing about the video of Student 1 until after she had posted the sticky note. A.M. asserts that the "YOU" in her sticky note is a reference to the school administration, which she believes has been inattentive to the needs of sexual assault survivors at Cape Elizabeth H.S.

On September 20, 2019, Shedd sent an email to Cape Elizabeth H.S. students and parents. The email contained a letter from him describing the sticky notes and stating that the notes "claimed adults in the school knew and implied that we would be indifferent." The letter stated that the students who found the notes "were concerned." It also stated that "[i]n the course of our investigation . . . we uncovered much misinformation some of which has been hurtful to a number of students and other people in

our community," including rumors being spread between students "by Snapchats, texts and Instagrams."

On September 24, 2019, school administrators again met with A.M. A.M. asserts that Shedd told her that he understood the "YOU" in her note to refer to the Cape Elizabeth H.S. administration. Shedd asked A.M. to provide the names of the students who wrote the other notes, but she refused to provide the names of any other students she suspected of writing notes. On September 26, one of the two other female students who posted notes admitted to doing so. That same day, administrators spoke to a student who disclosed that she was a victim of sexual assault and who also reported knowing about three other assaults involving Cape Elizabeth H.S. students, and they had spoken to another student who had heard that five different students had been sexually assaulted by two different Cape Elizabeth H.S. seniors. On or before September 26, the defendants also identified a third female student who had posted notes.

On September 26, 2019, Shedd and Carpenter completed their investigation and concluded that all three students who posted notes would be suspended and that A.M.'s note constituted bullying of Student 1. Shedd and Carpenter decided on the lengths of the suspensions on September 30, 2019. They decided that A.M. would be suspended for three days, and the two other students would

be suspended for two days and one day.  This discipline was not communicated to A.M. until October 4.

On October 4, 2019, the Portland Press Herald published a story about the sticky notes, which included a statement made on the record by A.M. that was critical of the school's response to sexual assault.  Shedd and Wolfrom also made comments on the record in the article.[6]  That same day, Shedd and Carpenter met with A.M. to inform her that after investigating the sticky notes, they had concluded that her conduct "did in fact constitute an act of bullying within [the school's] policy."  They also gave her a letter, which specified that her conduct

> was part of a "pattern of . . . expression . . . directed at a student . . . that [created] an intimidating . . . educational environment . . . or [interfered] with the student's . . . ability to participate in or benefit from the services, activities, or privileges provided by the school."

The Maine statute that creates a right against bullying in public schools itself defines "bullying" as involving conduct "directed at a student or students," and the Cape Elizabeth H.S.'s anti-

---

[6]    The article also reported that the Cape Elizabeth School District had "conducted eight investigations into possible violations of Title IX last school year, seven of which concerned sexual harassment or assault."  The investigations led to the conclusion that violations "more likely than not" occurred in four cases.  In the verified complaint filed on behalf of A.M., she alleges that during the previous academic year, Cape Elizabeth H.S. had received at least ten Title IX complaints, five of which had been substantiated.

bullying policy uses that same definition of bullying. Me. Rev. Stat. Ann. tit. 20-A, § 6554(2)(B). The letter also stated that A.M. would be suspended for three days and it warned that "any future actions of this sort . . . may result in further and more severe consequences up to and including suspension and possible expulsion." The letter provided no other reasons for her suspension.

On October 9, 2019, Shedd sent another letter to Cape Elizabeth H.S. students and parents. He summarized the investigation into the sticky notes, complained about the attention the incident had brought to the school, and stated that "[t]he students who posted the sticky notes made a bad choice even though their intentions were good" and they "were well motivated." He also confirmed in the letter that the school was aware of previous student complaints of sexual assault, including one that had resulted in legal proceedings the previous academic year, and that the administration had uncovered rumors about another Cape Elizabeth H.S. student as a result of its investigation into the sticky notes.

Also on October 9, 2019, A.M. appealed her suspension to Superintendent Wolfrom. A.M. made three arguments to Wolfrom: that the suspension violated her First Amendment rights because she was engaged in "core political speech," that her conduct did not meet the definition of bullying under the school's policy, and

- 12 -

that her punishment was harsher than those of students who committed equal or greater offenses. A.M. emphasized that her note did not target a specific individual but rather the "rape culture" at Cape Elizabeth H.S.

Wolfrom denied the appeal in a letter dated October 11, 2019. As to A.M.'s First Amendment argument, Wolfrom rejected A.M.'s claim that she was engaged in "core political speech" because "not only [did] the language of the notes [A.M.] posted indicate that [her] speech was directed at a specific individual, but when [A.M.] [was] interviewed as part of the investigation, [she] stated directly that [she] intended to target one student."

Further, Wolfrom rejected A.M.'s argument that her conduct did not meet the definition of bullying under the school's policy and concluded that the three-day suspension was reasonable. Wolfrom's letter provided no other bases for affirming the suspension. She told A.M. that her suspension would commence on October 15, 2019.

B.  Procedural History

On October 13, 2019, A.M., by and through her mother Norris, filed a verified complaint in federal court alleging the two counts described earlier. A.M. also moved for a temporary

restraining order and a preliminary injunction to prevent the defendants from implementing the three-day suspension.[7]

On October 24, 2019, after briefing and oral argument, the district court granted A.M.'s motion for a preliminary injunction on her First Amendment claim.  Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 358.  It did not reach her Title IX claim.  Id. at 358 n.2.  The district court decision addressed the four elements to be considered when assessing a motion for a preliminary injunction: likelihood of success on the merits, likelihood of irreparable harm absent interim relief, balance of the equities, and service of the public interest.  Id. at 358.

As to likelihood of success on the merits, the parties agreed that A.M. had suffered an adverse action by the defendants and that the allegedly protected conduct was a substantial or motivating factor in the adverse action.  Id. at 360-61.  The district court focused on the question of whether A.M.'s conduct was constitutionally protected.  Id. at 361.  It reviewed the Supreme Court's First Amendment precedents, focusing on Tinker v. Des Moines Independent School District, 393 U.S. 503 (1969), which it said held that "school officials may not restrict student speech without a reasonable forecast that the speech would either (1) substantially interfere with the requirements of appropriate

_____

    7    The defendants agreed not to enforce the suspension until the district court's ruling on that motion.

- 14 -

school discipline or (2) invade the rights of others." Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 361.

The district court then described three Supreme Court student speech cases decided after Tinker, which it characterized as setting out "narrower" rules that allow the government to restrict student speech without relying on one of the Tinker justifications. Id. at 362-63. These cases are Bethel School District No. 403 v. Fraser, 478 U.S. 675, 685 (1986), which held that school officials may restrict lewd speech in schools; Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 273 (1988), which held that school officials may restrict school-sponsored speech if those restrictions are "reasonably related to legitimate pedagogical concerns;" and Morse v. Frederick, 551 U.S. 393, 409-10 (2007), which held that school officials may restrict speech that can be reasonably interpreted as promoting illegal drug use. The district court concluded that none of the holdings in these three cases undercut A.M.'s First Amendment claim. Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 362.

The district court then turned to whether A.M. had met her burden of establishing a likelihood of success on her assertion that her speech was constitutionally protected. Id. at 362-63. Before assessing whether her speech was constitutionally protected, the district court acknowledged that "it is important that [school] administrators receive sufficient leeway to conduct

- 15 -

their duties without unnecessary interference" but that it is nevertheless "necessary from time to time that a court countermand the action of a local school authority."  Id. at 362; see also id. at 362 n.5 ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." (quoting Kuhlmeier, 484 U.S. at 273)).  The district court noted at the hearing that the justification for the suspension given by the defendants in the litigation went beyond the bullying rationale articulated to A.M. and the school community for the suspension.  The district court did not otherwise discuss or consider any sort of deference to the bullying determination made by the school administrators or the other reasons proffered in the defense of the litigation.

The district court first rejected the defendants' litigation argument that A.M.'s statement was defamatory as to Student 1 and was not protected under the First Amendment at all. Id. at 363.  The district court stated that the "record is not clear" as to whether A.M.'s note was "concerning" Student 1 and made with "fault amounting at least to negligence."  Id.  The district court highlighted the significant factual disputes in the record regarding the good faith intentions of A.M.'s note and whether she had admitted to targeting Student 1.  Id.  It stated that "the evidence suggesting [A.M.'s] speech might have defamed Student 1 is not enough to undermine a finding that she is

otherwise likely to succeed on the merits of her First Amendment claim." Id. at 363-64 (emphasis in original).

Instead, the district court reasoned that the record more clearly supported the conclusion that A.M.'s sticky note was political speech. Id. at 364. The district court stated that it would consider an "objectively reasonable interpretation of the speech, not the speaker's motive." Id. (citing Morse, 551 U.S. at 402). This inquiry, the district court stated, "may be informed by context, including the identity of the speaker." Id. The district court took note of A.M.'s statement of her reasons, which was to comment on "the crisis of sexual assault in public schools and the importance of appropriate school procedures to address it." Id. The district court concluded that A.M.'s note "expresses political advocacy on a question of significant public consequence" -- how public schools handle sexual assault. Id. Given the heightened First Amendment protections for speech on issues of public concern, the district court concluded that A.M. had established a likelihood of success in showing that her speech was constitutionally protected. Id. (citing First Nat'l Bank of Bos. v. Bellotti, 435 U.S. 765, 776 (1978)).

The district court applied Tinker to determine if the defendants had undermined A.M.'s likelihood of success by showing that the suspension was justified. Id. at 364-65. It highlighted the significant factual disputes that remained in the record. Id.

- 17 -

at 365. As to the defendants' litigation arguments related to substantial disruption of school activities, the district court concluded that the defendants had failed to undermine A.M.'s showing of likelihood of success on the merits. Id. at 365-66. The district court stated that the defendants' litigation argument that A.M.'s note was "inherently" disturbing because a reader "might believe an active rapist was presently walking the halls of the school building" was not reasonable. Id. at 365 (internal quotation marks omitted). The district court also rejected the defendants' contention that A.M.'s note in fact caused substantial disruption, concluding that the "worr[y] and concern[]" of the student who found A.M.'s sticky note in addition to the time spent by administrators investigating the sticky notes and interviewing forty-seven students caused less disruption than that deemed insufficient in Tinker. Id. at 365-66. It noted that the cases the defendants relied on all involved "actual threats of harm or violence," whereas "there [was] no evidence that A.M.'s note incited violent behavior . . . or even wrecked any part of the academic schedule." Id. (internal quotation marks omitted).

The district court also concluded that the defendants had failed to undermine A.M.'s showing of likelihood of success on the merits by arguing that her speech invaded the rights of others. Id. at 366-67. Because Maine law prohibits bullying in public schools, demonstrated bullying would constitute an invasion of the

- 18 -

rights of the bullied student.  See Me. Rev. Stat. Ann. tit. 20-A, § 6554(1), (3).  The district court emphasized that "because there are significant factual disputes regarding A.M.'s alleged bullying and the attenuated causal relationship between her sticky note and the harm suffered by Student 1, . . . Defendants have failed to undermine Plaintiff's showing of likelihood of success on her First Amendment claim."  Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 366.  As to the defendants' argument that A.M. had admitted she intended the note to target Student 1, the court noted that A.M. denied making such a statement and this was a disputed fact to be resolved in further proceedings.[8]  See id. at 366-67. The district court emphasized that the note did not specifically name anyone and concluded that "[w]ithout a clear factual connection between A.M.'s note and Student 1, [the court] cannot find that her sticky note 'invaded' Student 1's rights under Tinker."  Id. at 367.

The district court also highlighted another "troublesome point of Defendants' argument; though Defendants hastily point out

---

[8]    The defendants claim that A.M. "admi[tted] that she intended to instill fear in the school by posting the note," while A.M. contends that "it was Principal Shedd who alleged that [she] was trying to instill fear . . . [and] [she] did not say that was [her] intent."  Id. (first alteration in original) (internal quotation marks omitted).  A.M. also asserts that she "ha[s] audio recordings of her meetings with administrators that refute Defendants' contention that she directed her note at Student 1." Id.  A.M. did not introduce any such recordings into evidence during the preliminary injunction hearing.

that A.M. was adjudicated to have 'bullied' Student 1 under Cape Elizabeth High School's bullying policy, they do not closely link her protected speech to the actual harm he suffered." Id. The court rejected the defendants' reliance on Kowalski v. Berkeley County Schools, 652 F.3d 565, 572-74 (4th Cir. 2011), which involved a student who specifically named the other student who was the target of the verbal attacks and used photographs of the targeted student to reinforce those attacks. It reasoned that, unlike in Kowalski, the note here "stayed up for a matter of minutes, did not specifically name an individual, did not use photos, and arguably targeted the administration . . . rather than the 'rapist.'" Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 367. The district court concluded that "[b]ecause the record does not speak with any clarity that A.M.'s note, in fact, caused reputational and educational harm to Student 1, . . . Defendants have failed to undermine Plaintiff's showing of likelihood of success on her First Amendment claim by pointing to this [invasion of rights] justification." Id.

The district court turned to the other preliminary injunction elements and held that each weighed in favor of A.M. It concluded that A.M. had shown irreparable harm, noting that the Supreme Court has stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Id. (alteration in original)

- 20 -

(quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  As to the balance of the equities, it stated that the only harm to the school was a delay in punishing A.M., while A.M. "would miss three days of school and, most significantly, her ability to speak on the topic of sexual assault or serve as a victim advocate would be chilled."  Id. at 368.  The district court concluded that the balance of the equities weighed in A.M.'s favor because she would "suffer significant First Amendment harm if Defendants' punishment chill[ed] her from engaging in otherwise constitutionally-protected speech."  Id.  It determined that the public interest weighed in her favor because her statement constituted non-frivolous expression about the operation of her public school. Id. at 368-69.

The defendants timely appealed.

## II.

"We review the district court's decision to grant a preliminary injunction for abuse of discretion."  Doe v. Trs. of Bos. Coll., 942 F.3d 527, 532 (1st Cir. 2019).  We review the district court's findings of fact for clear error and conclusions of law de novo.  Id.

When assessing a request for a preliminary injunction, a district court must consider "(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether

- 21 -

granting the injunction is in the public interest." Shurtleff v. City of Bos., 928 F.3d 166, 171 (1st Cir. 2019). Likelihood of success on the merits "is the most important of the four preliminary injunction factors." Doe, 942 F.3d at 533; see also Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015) ("In this circuit, proving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002))).

"[A] party who appeals from the issuance . . . of a preliminary injunction . . . bear[s] the considerable burden of demonstrating that the trial court mishandled the fourpart framework." Maine Educ. Ass'n Benefits Tr. v. Cioppa, 695 F.3d 145, 152 (1st Cir. 2012) (quoting Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998)).

The defendants have not challenged the district court's conclusions as to irreparable harm, balance of the equities, or the public interest, so we accept them. They have also not argued that the district court's factual findings constituted clear error.[9] Therefore, we focus our analysis on the district court's

_____

[9] Rather, the defendants advance three main legal challenges on appeal: (1) the district court "erroneously concluded that the sticky note A.M. posted in the bathroom at the High School was core political speech entitled to the highest level of protection under the First Amendment"; (2) it "erroneously failed to analyze this case under the framework developed by the

- 22 -

conclusion that A.M. has shown a likelihood of success on the merits of her First Amendment claim.

A.    A.M. Has Established a Likelihood of Success in Demonstrating that Her Sticky Note was Constitutionally Protected Speech

The defendants first contend that the district court abused its discretion by "erroneously conclud[ing] that [A.M.'s] sticky note constituted core political speech."  They argue that as "non-political" speech, A.M.'s sticky note should have been analyzed under Fraser, Kuhlmeier, and Morse, rather than Tinker. In the defendants' view, Tinker is reserved only for political student speech, while Fraser, Kuhlmeier, and Morse set out an approach for all "non-political" student speech that is more deferential toward school administrators than Tinker.  A.M. disagrees and characterizes Fraser, Kuhlmeier, and Morse as only "narrow exceptions" to Tinker.  She argues that the district court properly concluded that these exceptions did not apply, that she had shown that her speech was political, and that Tinker applied. The Supreme Court has not expressly adopted either of the parties' characterization of the student speech cases.[10]

_____

Supreme Court in the student speech cases decided since Tinker"; and (3) it "erroneously concluded that the undisputed facts of this case did not meet the Tinker standard."

[10]    We note that several circuits have characterized Fraser, Kuhlmeier, and Morse as "exceptions" to the Tinker general rule. See Yeasin v. Durham, 719 Fed. App'x 844, 851 (10th Cir. 2018) (unpublished); Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 435 (4th Cir. 2013); Cox v. Warwick Valley Cent. Sch. Dist., 654

- 23 -

We do not read the First Amendment protections in Tinker as being restricted to only core political speech.  No Supreme Court case has held that Tinker's protections are limited to only core political speech.  And we do not read the majority opinion or Justice Alito's concurrence in Morse as articulating a limit on Tinker's framework.  See Morse, 551 U.S. at 397, 407-09; id. at 422 (Alito, J., concurring) ("I join the opinion of the Court on the understanding that . . . it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue . . . .").  While the majority opinion and Justice Alito's concurrence both discuss the political nature of the speech at issue in Tinker, that discussion was simply to distinguish the speech at issue in Morse from speech that is "at the heart of the First Amendment."  Id. at 403; see also id. at 423 (Alito, J., concurring).  Those opinions do not go further to state that only speech that can be reasonably interpreted as political is protected in schools.

Instead, both make a point to emphasize that speech advocating illicit drug use in schools poses unique and severe dangers and implicates school officials' special role in

F.3d 267, 272-73 (2d Cir. 2011); J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 927 (3d Cir. 2011); Morgan v. Swanson, 659 F.3d 359, 387 (5th Cir. 2011) (en banc).  We need not delve into what is meant by that exception language.

- 24 -

"protect[ing] those entrusted to their care from the dangers of drug abuse."  Id. at 408; see also id. at 424-25 (Alito, J., concurring) ("Speech advocating illegal drug use poses a threat to student safety that is just as serious, if not always as immediately obvious.  As we have recognized in the past and as the opinion of the Court today details, illegal drug use presents a grave and in many ways unique threat to the physical safety of students.  I therefore conclude that the public schools may ban speech advocating illegal drug use.").  Had the speech in Morse reasonably been interpreted as political or commenting on a matter of public concern, the school would likely have had to justify the speech restriction under the heightened burden of Tinker because of the core First Amendment protection for such speech, but that does not mean that all non-political speech is unprotected under Tinker.

Furthermore, this circuit has cited Tinker in discussing First Amendment protection for social events held on a public university campus.  See Gay Students Org. of Univ. of N.H. v. Bonner, 509 F.2d 652, 660, 662-63 (1st Cir. 1974) (citing Tinker for the proposition that a public university could prohibit actions which "materially and substantially disrupt the work and the discipline of the school," but concluding that the university had not shown any such improper conduct at the plaintiff's social

events in order to prohibit those social activities on campus (quoting Tinker, 393 U.S. at 513)).

Other circuits have held that Tinker's protections are not limited to core political speech. See J.S. ex rel. Snyder, 650 F.3d at 926 ("Although Tinker dealt with political speech, the opinion has never been confined to such speech."); Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755, 766 (9th Cir. 2006) ("In striking the balance 'between the First Amendment rights of students and preservation of the educational process,' neither Tinker nor its progeny limited students' rights solely to the exercise of political speech or speech that touches on a matter of public concern." (quoting LaVine v. Blaine Sch. Dist., 257 F.3d 981, 988 (9th Cir. 2006))); see also Kowalski, 652 F.3d at 571-73 (applying the Tinker framework to non-political speech). Instead, Tinker provides the framework for justifying the restriction of student speech that is otherwise protected. See, e.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 112 (3d Cir. 2013).[11]

Whether or not this anonymous note containing an accusation of criminal activity was core political speech, we hold

---

[11] Because we conclude that Tinker is not limited to political speech, we need not decide if A.M.'s sticky note, understood in the context of her prior activities related to sexual assault activism including her statements to the Cape Elizabeth H.S. school board, was objectively viewed as political. We do not endorse the district court's reasoning on this point.

that it is entitled to some First Amendment protection.[12] See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 342 (1995) (holding that anonymous speech is constitutionally protected); Pinard, 467 F.3d at 768 (holding that high school student athletes' petition requesting the resignation of their basketball coach was protected speech under Tinker); Seamons v. Snow, 84 F.3d 1226, 1237-38 (10th Cir. 1996) (holding that a high school student athlete's report of physical assault in the locker room as part of a hazing ritual was protected speech under Tinker).

A.M.'s sticky note communicated its message in written words and so it plainly constitutes "pure speech," which "is entitled to comprehensive protection under the First Amendment." Tinker, 393 U.S. at 505-06. The defendants do not challenge the district court's conclusion that A.M.'s note could not be restricted as lewd under Fraser, school sponsored under Kuhlmeier, or advocating illegal drug use under Morse. Nor could the defendants succeed on such an argument. A.M.'s sticky note contained no speech that could be viewed as "offensively lewd" or "indecent," Fraser, 478 U.S. at 685, nor did it reference any drug use. Morse, 551 U.S. at 403. Finally, a sticky note posted by a

_____

[12] We focus our analysis on A.M.'s sticky note, rather than her statements to the Portland Press Herald, because the school's position is that it punished A.M. for the note and A.M. focuses her arguments on the note as well.

- 27 -

student in a student bathroom is not reasonably viewed as school sponsored.  Kuhlmeier, 484 U.S. at 273.

Moreover, the defendants do not argue that A.M.'s speech falls within any of the recognized categorical exceptions to First Amendment protection.[13]  See, e.g., United States v. Alvarez, 567 U.S. 709, 717-22 (2012) (some types of false statements, including defamation and fraud); New York v. Ferber, 458 U.S. 747, 764-65 (1982) (child pornography); Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 562, 566-67 (1980) (commercial speech that is false, misleading, or proposes illegal transactions); Miller v. California, 413 U.S. 15, 23 (1973) (obscenity); Brandenburg v. Ohio, 395 U.S. 444, 447-48 (1969) (per curiam) (incitement of imminent lawless action); Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam) (true threats); Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942) (fighting words).

Because A.M. has established a likelihood of success on the merits in demonstrating that her sticky note was protected

---

[13]    The defendants did argue in the district court that A.M.'s sticky note was defamatory and could be restricted on that basis.  The district court rejected that claim in finding that A.M. had demonstrated a likelihood of success that her speech was protected, and the defendants do not challenge that aspect of the district court's ruling on appeal.  See Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 363-64.  We need not address that issue.  See Portugués-Santana v. Rekomdiv Int'l Inc., 725 F.3d 17, 23 n.4 (1st Cir. 2013).

speech, we apply Tinker to determine if the school has demonstrated that it was justified in restricting her speech.

B.    The Defendants Have Failed to Demonstrate that They Can Meet Their Burden Under Tinker to Justify the Restriction of A.M.'s Speech

We acknowledge that the posting of an anonymous note by a student accusing another person in the school of a crime or crimes and suggesting knowledge of such criminal activity by others, including school administrators, is a serious event and legitimately of concern to school administrators. Tinker states that school officials' restriction of student speech is justified when: (1) actual "disturbances or disorders on the school premises in fact occur[]"; (2) "the record . . . demonstrate[s] . . . facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities"; or (3) the speech invades the rights of others. 393 U.S. at 513-14. We conduct the Tinker inquiry objectively. See, e.g., Bell v. Itawamba Cty. Sch. Bd., 799 F.3d 379, 398 (5th Cir. 2015) (explaining that in applying Tinker, courts analyze "the objective reasonableness . . . of a forecasted substantial disruption" based on the facts in the record); Cuff ex rel. B.C. v. Valley Cent. Sch. Dist., 677 F.3d 109, 113 (2d Cir. 2012) ("The test [under Tinker] is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student.").

"But . . . undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Tinker, 393 U.S. at 508. Generally, the circuits have concluded that Tinker places the burden on the school to justify student speech restrictions. See B.H. ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 321 (3d Cir. 2013) (en banc); see also Bell, 799 F.3d at 398; Hardwick ex rel. Hardwick, 711 F.3d at 439; Trachtman v. Anker, 563 F.2d 512, 516-17 (2d Cir. 1977). We agree with this conclusion. Thus, the defendants must demonstrate a likelihood that the restrictions on A.M.'s speech were justified.

1.  The Defendants Must Rely Solely on Bullying as the Justification for the Speech Restrictions Because It Was the Only Justification Originally Provided to A.M.

As an initial matter, we will address what reasons the defendants may rely on to justify the restrictions on A.M.'s speech. The only justification the school administration articulated to A.M. for her suspension in its October 4th letter was that her sticky note "did in fact constitute an act of bullying within [the school's] policy." We again recount the school's actual description of A.M.'s conduct:

> [It] was part of a "pattern of . . . expression
> . . . directed at a student . . . that
> [created] an intimidating . . . educational
> environment . . . or [interfered] with the
> student's . . . ability to participate in or

- 30 -

benefit from the services, activities, or privileges provided by the school."

In Superintendent Wolfrom's October 11th letter to A.M., Wolfrom rejected A.M.'s administrative appeal of her suspension, affirming the school's determination that A.M. had violated its policy against bullying. That letter mentioned no other reasons for affirming the suspension.

The defendants may not rely on post hoc rationalizations for the speech restrictions, but rather must rely only on the reasons originally provided to A.M. for her suspension.[14] In Tinker and its progeny, the Supreme Court considered only those justifications offered to the students when they were disciplined in assessing the permissibility of the speech restrictions, not reasons that were articulated only after litigation commenced. See Tinker, 393 U.S. 509-10, 509 n.3 (focusing on the school's

---

[14] The defendants assert that A.M.'s sticky note actually disrupted the school's activities because of the resulting Title IX investigation, and that a reasonable school administrator could plausibly have forecasted substantial disruption to the school's activities because of the incendiary language used in the note. However, neither of these reasons was provided to A.M. in the letter from the school administration justifying her suspension, nor were these reasons mentioned in the letter from Wolfrom affirming that punishment. It was not until after litigation commenced that the school administration raised these distinct justifications for the first time.

The defendants also raised for the first time in the district court the litigation argument that A.M.'s sticky note was defamatory and could be restricted on that basis. As already discussed, we need not address that litigation argument which was not raised on appeal. See supra note 13.

official statement regarding the students' suspension to determine the reasons for the speech restrictions on an independent review of the record); see also Morse, 551 U.S. at 397-98, 401; Kuhlmeier, 484 U.S. at 263-64, 274-75; Fraser, 478 U.S. at 678-79, 683-85.

The Supreme Court has never stated that school administrators can rely on new rationales for student speech restrictions formulated only after litigation has begun. The Court in Tinker emphasized that "students . . . [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," 393 U.S. at 506, and school administrators generally may not restrict student speech unless it is or is reasonably forecasted to be substantially disruptive or it invades the rights of others. Id. at 513-14. If school administrators are permitted to use shifting rationales for student speech restrictions that were not articulated at the time their decision was made, there is a risk that those post hoc rationalizations would not have been true bases for their decision. Such shifting rationales may provide convenient litigating positions for the school administrators in defending their decision, but they are too easily susceptible to abuse by obfuscating illegitimate reasons for speech restrictions. Indeed, a school cannot suppress speech simply because it is unpopular with or critical of the school administrators. See, e.g., id. at 509-10.

The Supreme Court has held that state actors may not rely on shifting rationales to justify speech restrictions in a different First Amendment context. See City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 758 (1988) (stating that in the context of standardless licensing programs for newsracks, "[w]ithout . . . guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression" (emphasis in original) (collecting cases)).

We and other circuits have applied that rule. See Van Wagner Bos., LLC v. Davey, 770 F.3d 33, 37 (1st Cir. 2014) (discussing City of Lakewood and the "concerns undergird[ing] the Court's conceptualization of injury"); OSU Student All. v. Ray, 699 F.3d 1053, 1064 (9th Cir. 2012) (explaining that "[b]ecause defendants offered the explanations only after the confiscation [of the student newspaper], in an effort to justify the University's application of an unannounced and unenforced policy, the explanations cannot be distinguished from post hoc rationalizations" (emphasis in original) (citing City of Lakewood, 486 U.S. at 760)); Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty., 653 F.3d 290, 296 (3d Cir. 2011) ("Because the Port Authority did not mention this basis [for

- 33 -

rejecting the plaintiff's commercial speech under the Port Authority's advertising policy] until after the lawsuit had been filed, the District Court permissibly found that it was not a real basis for rejecting the ad but was, instead, a post hoc rationalization."); Bourgeois v. Peters, 387 F.3d 1303, 1322-23 (11th Cir. 2004) ("[T]he City merely invites us to engage in post hoc rationalizations of its policy, which is precisely one of the dangers that attaches to the sort of uncabined, impulsive policymaking practice at issue in this case." (emphasis in original) (citing City of Lakewood, 486 U.S. at 758)); Summum v. City of Ogden, 297 F.3d 995, 1005-06 (10th Cir. 2002) (recognizing "the caselaw's particular concern for post hoc rationalizations in the Free Speech Clause context").[15]

In addition, such after-the-fact attempts to justify government actions on newly found justifications are disfavored in other areas of the law. For example, due process requires that, at a minimum, a student be given notice of the charges against her and an opportunity to be heard as to those charges in connection with a suspension of ten days or fewer to prevent arbitrary exclusion from school. Goss v. Lopez, 419 U.S. 565, 579, 581

---

[15] See also Safelite Grp., Inc. v. Jepsen, 764 F.3d 258, 265 (2d Cir. 2014) ("As an initial matter, in light of the record evidence that the legislation at issue was designed to benefit Safelite's competitors, we are skeptical that the government's asserted consumer protection interests are genuine and not merely post-hoc rationalizations." (citation omitted)).

(1975); <u>Zell</u> v. <u>Ricci</u>, 957 F.3d 1, 11 (1st Cir. 2020); <u>Donovan</u> v. <u>Ritchie</u>, 68 F.3d 14, 17 (1st Cir. 1995) (finding adequate notice where the principal sent a letter to the student elaborating on and specifying the bases for suspension and referring to the relevant school policy). Indeed, "[n]otice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process." <u>Gorman</u> v. <u>Univ. of R.I.</u>, 837 F.2d 7, 12 (1st Cir. 1988) (collecting cases); <u>see also</u> <u>Cleveland Bd. of Educ.</u> v. <u>Loudermill</u>, 470 U.S. 532, 546 (1985); <u>Kercado-Melendez</u> v. <u>Aponte-Roque</u>, 829 F.2d 255, 263 (1st Cir. 1987).[16]

In the administrative law context, "[i]t is a 'foundational principle . . . ' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action'" and a reviewing court may not uphold agency action "on the basis of impermissible '<u>post hoc</u> rationalization.'"

---

[16] While the plaintiff did not allege a due process violation in her verified complaint, nor raise such a claim on appeal, the district court at the preliminary injunction hearing inquired as to whether considering the school's new justifications for the speech restrictions would violate A.M.'s right to due process. Plaintiff's counsel responded in the affirmative and argued that the district court should therefore not consider the school's new justifications for the speech restrictions. Defendants' counsel never addressed the district court's due process question, and the district court ultimately did not discuss the due process issue in its order granting the preliminary injunction. It is clear, however, that both parties were aware of the issue of later articulated rationales.

- 35 -

Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1907-08 (2020) (emphasis in original) (first quoting Michigan v. EPA, 576 U.S. 743, 758 (2015); and then quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971)); see also Dep't of Commerce v. New York, 139 S. Ct. 2551, 2575-76 (2019) (explaining that the requirement of reasoned explanation for agency action means that there cannot be a disconnect between the agency's decision and its explanation for that decision). As the Supreme Court has explained, the rule against considering post hoc rationalizations is not merely a formality, but rather it serves important administrative law values of promoting "agency accountability," ensuring that the reasons given for agency action are not merely "convenient litigating position[s]," and facilitating judicial review of agency action. Dep't of Homeland Sec., 140 S. Ct. at 1909 (alteration in original) (first quoting Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 643 (1986); and then quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012)).[17]

---

[17] Those values are relevant here. Requiring the school administration to stick to the reasons it initially provided for the speech restrictions promotes accountability for school officials by ensuring that students and their parents "can respond fully and in a timely manner to [the state's] exercise of authority." Id. A.M. was not able to respond at the time of her suspension to the school's new contentions that her speech substantially disrupted or was reasonably likely to disrupt school activities. And as discussed above, considering only those reasons given at the time of the school's decision prevents the use of

- 36 -

At least on the record here, we hold that the defendants may rely only on the justification originally provided to A.M. for their decision.  Therefore, if the restriction on speech here is to be justified at all, the defendants must justify it on the basis that A.M.'s speech constituted bullying in violation of the school's policy.

2.    The Facts in the Record Support the District Court's Determination that the Defendants Failed to Demonstrate a Causal Connection Between the Note and the Alleged Harm

On the preliminary injunction record, the district court concluded as a matter of fact that the school had not shown that the sticky note caused or led to the bullying of Student 1.  See Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 366-67.  We see no clear error in that factual conclusion.  While we disagree with one aspect of the district court's legal analysis, that disagreement does not lead to the conclusion that there was an abuse of discretion in granting the preliminary injunction.  See I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 41, 44-45 (1st Cir. 1998) (affirming the district court's denial of a preliminary injunction, even though it applied an incorrect legal analysis,

---

"shifting or illegitimate criteria" that did not form the true bases for the school's decision but which now present convenient litigating positions.  City of Lakewood, 486 U.S. at 758; see also Dep't of Homeland Sec., 140 S. Ct. at 1909.

because there was adequate evidence in the record to support its determination as to likelihood of success).

We use the rule well recognized in this Circuit that "[a] trial court's findings of fact, made in connection with one legal theory, may often be treated as fungible in connection with another." Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 7 (1st Cir. 2007). We have employed this reasoning to uphold a factual determination made by a district court even though that determination was made in connection with a misapprehension of law. See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir. 1992) ("Although this determination is tainted by a misunderstanding of the applicable legal principles, the court's subsidiary findings are, nonetheless, reasonably explicit and subject to reuse."); see also C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 288 (1st Cir. 2008) (explaining that "where the evidence supports a district court's findings of fact, we may realign those findings under a different legal matrix and decide the case on that basis").

We agree with the school that bullying is the type of conduct that implicates the governmental interest in protecting against the invasion of the rights of others, as described in Tinker. See Kowalski, 652 F.3d at 572; see also C.R. v. Eugene Sch. Dist. 4J, 835 F.3d 1142, 1152-53 (9th Cir. 2016). Thus, schools may restrict such speech even if it does not necessarily

- 38 -

cause substantial disruption to the school community more broadly. However, for a school to rely on that basis for restricting student speech, there must be a reasonable basis for the administration to have determined both that the student speech targeted a specific student and that it invaded that student's rights.[18]

The district court recognized the general principles that school administrators should be given discretion in how they operate their schools and that federal courts are not in the business of educating students. See Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 362, 362 n.5. Despite this, however, the district court did not discuss or consider what deference, if any, was owed to the defendants' stated justification for the speech restrictions.

---

[18] We need not delineate the precise boundaries of what speech constitutes "bullying" such that it falls within the "invasion of the rights of others" framework of Tinker. Neither party engaged the question of whether, under this aspect of Tinker, a school can punish a student for publicly posting an accusation that targets another student, no matter how fleeting or vague the statement.

It is clear, however, that speech that is merely offensive to the listener is not enough. See Tinker, 393 U.S. at 508-09; Wynar v. Douglas Cty. Sch. Dist., 728 F.3d 1062, 1072 (9th Cir. 2013); Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 217 (3d Cir. 2001). And school administrators must be permitted to exercise discretion in determining when certain speech crosses the line from merely offensive to more severe or pervasive bullying or harassment. See Cox, 654 F.3d at 274; Zamecnik v. Indian Prairie Sch. Dist. No. 204, 636 F.3d 874, 877-78 (7th Cir. 2011); see also DeJohn v. Temple Univ., 537 F.3d 301, 319-20 (3d Cir. 2008); Saxe, 240 F.3d at 217.

The Supreme Court has repeatedly emphasized the necessary discretion school officials must exercise and the attendant deference owed to many of their decisions. See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 686 (2010) ("Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'" (alteration in original) (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206 (1982))); Morse, 551 U.S. at 403; Kuhlmeier, 484 U.S. at 273; Fraser, 478 U.S. at 683; Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 863-64 (1982); Wood v. Strickland, 420 U.S. 308, 326 (1975) ("The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members and § 1983 was not intended to be a vehicle for federal-court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." (collecting cases)), overruled in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).

Courts generally defer to school administrators' decisions regarding student speech so long as their judgment is

reasonable.  See Bell, 799 F.3d at 397 ("[I]n deference to the judgment of the school boards, we refer ad hoc resolution of . . . issues [such as this one] to the neutral corner of 'reasonableness.'" (alterations in original) (quoting Shanley v. Ne. Indep. Sch. Dist., Bexar Cty., Tex., 462 F.2d 960, 971 (5th Cir. 1972))); B.H. ex rel. Hawk, 725 F.3d at 317 (adopting an approach of deferring to school administrators' reasonable judgment in interpreting speech that is ambiguously lewd, vulgar, profane, or offensive); Hardwick ex rel. Hardwick, 711 F.3d at 440 ("As long as school officials reasonably forecast a substantial disruption, they may act to prevent that disruption without violating a student's constitutional rights, and we will not second guess their reasonable decisions." (citing Tinker, 393 U.S. at 513-14)); J.S. ex rel. Snyder, 650 F.3d at 928-31 (declining to defer to the school's conclusion as to potential for substantial disruption where the facts did not support a reasonable forecast of substantial disruption); Pinard, 467 F.3d at 767-68 ("[O]ur deference to school officials in regulating student speech does not diminish our duty to ensure that they do not infringe students' First Amendment rights under Tinker."); Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist., 941 F.2d 817, 829 (9th Cir. 1991); Trachtman, 563 F.2d at 519; see also Christian Legal Soc'y, 561 U.S. at 686, 687 n.16 (noting that while "determinations of what constitutes sound educational policy . . . fall within the

- 41 -

discretion of school administrators and educators," the ultimate "question whether a [school] has exceeded constitutional constraints" rests with the courts and courts "owe no deference to [schools] when [they] consider that question" (citing Rowley, 458 U.S. at 206 and Pell v. Procunier, 417 U.S. 817, 827 (1974))).

We first address the subsidiary issue of the appropriate timeframe by which to assess the administration's interpretation of the note as bullying Student 1. The defendants contend that the administration's interpretation of the speech must be assessed at the time the note was first posted, based only on the content of the note itself and what was known by school officials at that time. The plaintiff submits, however, that A.M.'s speech must be assessed at the time her punishment was ultimately imposed, in the context of what was then known to administrators after the ten-day investigation.

It appears that courts applying Tinker generally consider all relevant facts known to the school administrators at the time they disciplined the student or decided to restrict the speech. See, e.g., Tinker, 393 U.S. at 508-10, 514; J.S. ex rel. Snyder, 650 F.3d at 928-31; Doninger v. Niehoff, 527 F.3d 41, 50-51 (2d Cir. 2008); Lowery v. Euverard, 497 F.3d 584, 596 (6th Cir. 2007); LaVine, 257 F.3d at 989-90 ("When the school officials made their decision . . . , they were aware of a substantial number of facts that in isolation would probably not have warranted their

response, but in combination gave them a reasonable basis for their actions."). Given that we have already determined that the defendants here cannot rely on the actual or forecasted substantial disruption justifications, we analyze A.M.'s speech at the time that the suspension decision was made. That is because the school determined that her sticky note constituted bullying only after their ten-day investigation revealed further information about the note and rumors circulating throughout the school community.

The district court gave no deference to the school's determination that A.M. intentionally targeted Student 1 through her note. Rather, the court emphasized the conflicting evidence with respect to that issue but did not explain why the evidence tipped in her favor in the context of the preliminary injunction standard. See Cape Elizabeth Sch. Dist., 422 F. Supp. 3d at 366-67. If the evidence establishes that it is equally likely that A.M.'s note targeted Student 1 or did not, we could not say that the school was objectively unreasonable in determining that the note targeted Student 1.

That does not mean, however, that we must reverse the district court's decision. As the district court stated, the defendants' evidence did not establish a link between A.M.'s protected speech and the harm Student 1 suffered. Id. at 367. The district court concluded that this failure meant the defendants had not provided a justification sufficient to undermine her

- 43 -

likelihood of success. Id. Even if a school administrator arguably could have reasonably concluded that the unnamed "rapist" in the note referred to Student 1, there is a different question as to whether the note caused the bullying harm as the school system alleged. The district court's conclusion that the defendants failed to show the note caused the harm Student 1 suffered was not, on this record, clear error.

The problems with defendants' proof as to the causal link between the note and the bullying exist at several levels, of which we identify a few. Any bullying of Student 1 is regrettable. That does not mean A.M.'s note resulted in the bullying.

Information about Student 1 already known in the Cape Elizabeth H.S. community significantly weakens the theory that a causal connection existed between A.M.'s note and the bullying of Student 1. During its investigation, the school administration uncovered rumors that had already been in circulation within the school community prior to the posting of the sticky note. Some of those allegations of sexual misconduct centered on Student 1. Importantly, a video had been circulating within the student body for months before A.M. posted her note which explicitly bore the caption "this is Student 1 raping bitches." School officials, and no doubt students, were also aware of a student complaint from the previous academic year regarding an incident off of school grounds which had resulted in legal proceedings and a court protection

order against Student 1.  The defendants do not assert that A.M. directly participated in the bullying of Student 1 at school, or that she was responsible for the video or any of the rumors being circulated about Student 1.  Indeed, they make no attempt to disentangle the harm caused by the video and rumors circulated by other students.[19]  This makes it difficult to show it was the note and not some other factors which caused any bullying.

At the time of the posting of the note and at the conclusion of the investigation, both the other students at Cape Elizabeth H.S., and importantly, the administration, knew of several other complaints of sexual assault by different student perpetrators.  The administration knew that several female student complainants continued to pursue the issue.  Before punishing her, the school administrators determined that A.M. was the author of the initial note.  The school was well aware of A.M.'s prior advocacy against sexual assault.  A.M. posted the note only three months after she and other students raised their dissatisfaction with the school's handling of sexual assault to the school board.

---

[19]    The defendants' reliance on Kowalski v. Berkeley County Schools is misplaced.  In Kowalski, the plaintiff-student created a webpage that served "as a platform for [the plaintiff] and her friends to direct verbal attacks towards [a] classmate."  652 F.3d at 572-73.  The classmate was explicitly targeted by name and through photographs posted on the website. Id.  The Fourth Circuit concluded that the school could suspend her for this speech under Tinker.  Id. at 574.  A.M.'s note, in contrast, did not identify anyone specifically.

One of the students who had accompanied A.M. to the school board meeting was a known sexual assault survivor who had a Title IX complaint substantiated the previous academic year. Overall, Cape Elizabeth H.S. had received at least eight Title IX complaints during the previous academic year, at least four of which had been substantiated. The investigation into the notes reinforced that students other than Student 1 were thought to be perpetrators. A.M. alleges that during the course of the investigation, she told the administrators about a different student who had been accused of sexual assault the previous spring and who had been involved in a Title IX investigation. Other allegations of sexual assault involving various students and not naming Student 1 were also raised during the school's investigation.

The school's recent history with sexual assault complaints, together with A.M.'s status as a sexual assault advocate and confidant for victims, reinforces the school's own interpretation in its September 20th email that the note was, at least in part, directed at the school administration. This understanding of the note undercuts the defendants' claim that the note caused the bullying of Student 1. And the school is not permitted to punish a student merely because her speech causes argument on a controversial topic. See, e.g., Tinker, 393 U.S. at 508.

The text of the note and the circumstances of its discovery also undermine the notion that it caused the bullying of Student 1. The sticky note was not widely distributed to or viewed by members of the school community nor did it specifically name or otherwise describe a particular individual. Rather, it was only up in a girls' bathroom for a few minutes and was seen only by the one student who found it and one other student who actually brought the note to the administration. The note also contains a number of ambiguities which further undercut a close causal link between it and the bullying of Student 1. It is not clear from A.M.'s note whether the "rapist" is a student or teacher or school employee, nor does it identify the gender of the "rapist." A.M.'s note did not identify where or when the "rape" occurred, including whether it occurred at the school or even if it occurred recently. We also note that there are different understandings of what the term "rape" means. The term can be used broadly to encompass not only the traditional definition of rape, but also other lesser degrees of sexual assault or other sexual activity. Maine's law on sexual assault illustrates these different understandings.[20]

---

[20] In 1989, the Maine legislature revised its criminal statutes to eliminate the term "rape" and replaced it with a catalog of various sexual assault crimes. See Me. Rev. Stat. Ann. tit. 17-A, § 252 (repealed 1989); id. § 253; id. § 254; id. § 255-A; id. § 260. Among these sexual assault crimes is "sexual abuse of a minor," which is committed when the perpetrator is at least twenty-one and engages in a sexual act with a student who is sixteen or seventeen and is "enrolled in a . . . public . . .

Ambiguity as to who the "YOU" in A.M.'s sticky note refers also weakens the causal link between it and Student 1's bullying. The "YOU" could be understood as referring to other students using the girls' bathroom. But it also could be read as referring to the school administration. On this latter view, the sticky note is a statement speaking out against the Cape Elizabeth H.S. administration's perceived inadequate handling of sexual assault claims. This view is not unsupported by the record: the administration itself accepted this interpretation of A.M.'s note in its September 20th email to Cape Elizabeth H.S. students and parents.

Based on the record at this preliminary stage, we agree with the district court's determination that the defendants have not shown an apparent causal connection between A.M.'s sticky note and the bullying of Student 1.[21] The district court thus did not

---

secondary . . . school . . . [where] the actor is a teacher, employee or other official in the school district." Id. § 254(1)(C). This crime is also committed when the victim is fourteen or fifteen years old and the perpetrator is at least five years older. Id. § 254(1)(A). Cape Elizabeth H.S. covers grades nine through twelve and so there are some students who are fourteen, fifteen, sixteen, or seventeen years old. The ages of the students implicate this statutory provision and demonstrate the ambiguity in whether the "rapist" was a student or school employee.

[21] The defendants do not argue that, even if the note itself did not cause any harm to Student 1, it nevertheless invaded his rights. Rather, the defendants' arguments as to the invasion of the rights of another focus on the harm suffered by Student 1 as a result of his ostracization by students other than A.M.

abuse its discretion in determining that the defendants had not shown it was A.M.'s note which caused any invasion of Student 1's rights sufficient to justify the punishment imposed on A.M. for her protected speech.[22]

## III.

Posting the sticky note was far from the best way for A.M. to express her concerns about student-on-student sexual assault and Cape Elizabeth H.S.'s handling of sexual assault claims. The issue before us, however, is whether the district court abused its discretion in issuing the preliminary injunction. We hold that it did not.

Affirmed. Costs are awarded to A.M.

---

[22] The parties did not engage the question of whether a preexisting school policy forbidding the public posting of notes containing accusations against another student would affect the analysis under Tinker. Because the parties did not raise the issue, we need not address it.