USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1075 UNITED PAPERWORKERS INTERNATIONAL UNION, LOCAL 14, AFL-CIO-CLC, ET AL., Plaintiffs - Appellants, v. INTERNATIONAL PAPER COMPANY, Defendant - Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _____________________ Jeffrey Neil Young, with whom McTeague, Higbee, Libner, ____________________ __________________________ MacAdam, Case & Watson was on brief for appellants. ______________________ Jane B. Jacobs, with whom Andrew E. Zelman and Klein, ________________ __________________ ______ Zelman, Briton, Rothermel & Dichter, L.L.P. were on brief for _____________________________________________ appellee. ____________________ September 7, 1995 ____________________ TORRUELLA, Chief Judge. The plaintiff-appellants, TORRUELLA, Chief Judge ____________ United Paperworkers International Union, Local 14, AFL-CIO, and International Brotherhood of Firemen and Oilers, Local 246, AFL- CIO (the "Unions"), appeal the district court's decision on summary judgment in favor of International Paper Company (the "Company"), ruling that a recall agreement between the Unions and the Company became unenforceable upon the Unions' decertification. For the following reasons, we affirm. BACKGROUND BACKGROUND The Unions and the Company agree that there are no material facts in dispute. The Company owns and operates a paper mill in Jay, Maine known as the Androscoggin Mill (the "Mill"). Between 1965 and March 1993, employees at the Mill were represented for purposes of collective bargaining by the Unions. Throughout that time, the Unions and the Company have been parties to a series of collective bargaining agreements setting forth the terms and conditions of employment at the Mill. In June 1987, when the Company and the Unions could not reach an accord over a succeeding collective bargaining agreement, members of the Unions engaged in an economic strike. The Company hired replacement workers during the strike. In October of 1987, the Company laid off 151 striking employees (the "Employees"). All but three of these Employees had recall rights for twelve months after layoff.1 The twelve  ____________________ 1 The other three employees resigned in 1989 pursuant to a pension offer negotiated by the Unions. Therefore, these three employees are not at issue in this case. -2- month period in which the Employees were eligible for recall expired before the parties began strike settlement negotiations. On November 16, 1987, certain Mill employees petitioned the National Labor Relations Board (the "NLRB") to hold a decertification election to determine whether the Mill employees desired continued representation by the Unions. The actual election was delayed for over a year. On October 9, 1988, the Unions ended their strike and made an unconditional offer to return to work. Between October 18 and October 26, 1988, the Unions and the Company negotiated and executed an agreement setting forth terms and procedures under which former strikers would be recalled as replacement workers left and their positions became available. During negotiations, the Unions raised the issue of the 151 Employees who had been laid off in October 1987 and whose recall rights had technically expired. The final recall agreement provided, with limited exceptions, that the 151 laid off Employees would be among the employees recalled under the agreement. In April 1989, at the Unions' request, portions of the recall agreement were renegotiated and amended to include lists setting forth the order in which employees were to be recalled. The 151 laid off Employees were included on these lists. Both the October 1988 agreement and the April 1989 amended agreement were silent as to its duration or termination. The decertification petition was pending throughout the negotiations. -3- In July 1989, the NLRB conducted a decertification election at the Mill. Of the employees eligible to vote, 616 voted for decertification, and 361 voted against. After investigating and holding a hearing on the Unions' challenge to the election, the NLRB issued a decision upholding the election results and dismissing the Unions' objections. The Unions thus became decertified as of March 30, 1993. Both parties acknowledge that upon decertification, the then-existing collective bargaining agreement, which would otherwise have been effective until September 30, 1993, became null and void. In August 1993, the Company advised the Unions and several of the 151 laid off Employees that as a result of the Unions' decertification, the Employees no longer had recall rights. The Unions thereafter filed this action in the United States District Court for the District of Maine, contending that the recall agreement, unlike the collective bargaining agreement, survived the Unions' decertification and thus remained binding on the Company. Following cross-motions for summary judgment, the district court issued its decision on December 1, 1994. The district court found that there was no indication in the recall agreement itself that the parties intended it to survive decertification, despite the fact that the decertification petition had been filed and was pending during the negotiation of the agreement. The court explained that because the recall agreement establishes rights for a category of represented -4- employees, and explicitly specifies that its terms are to prevail if there is any conflict with "other provisions of the labor agreement," the recall agreement is "tied directly to the collective bargaining agreement," such that it contemplates "ongoing union involvement." Because the recall agreement would affect the Company's negotiations with a new union seeking to represent a majority of employees, and would "perpetuate a limited portion of the elements ordinarily covered by a collective bargaining agreement," the recall agreement cannot be said to be independent of the collective bargaining agreement. Therefore, the court reasoned, the recall agreement did not survive decertification. Accordingly, the court granted summary judgment in the Company's favor. DISCUSSION DISCUSSION A. Standards of Review A. Standards of Review ___________________ In general, summary judgment is proper only if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Therefore, a party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. Once this showing is made, the non-movant must point to specific facts demonstrating that there is a trialworthy issue. National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 _________________________ _______________ (1st Cir. 1995). An issue is "genuine" when the evidence relevant to it, viewed in the light most flattering to the non- moving party, is "sufficiently open-ended to permit a rational -5- factfinder to resolve the issue in favor of either side." Id. __ (citation omitted). Because the summary judgment standard requires the trial court to make a legal determination rather than to engage in factfinding, appellate review is plenary. Equal Employment Opportunity Comm'n v. Steamship Clerks Union _____________________________________ _______________________ 1066, 48 F.3d 594, 602 (1st Cir. 1995). ____ This standard is the norm. Having stated it, however, we must note that under our precedent, in certain, somewhat unusual cases, this standard does not apply. In a nonjury case, when the basic dispute between the parties concerns only the factual inferences that one might draw from the more basic facts to which the parties have agreed, and where neither party has sought to introduce additional factual evidence or asked to present witnesses, the parties are, in effect, submitting their dispute to the court as a "case stated." Steamship Clerks, 48 ________________ F.3d at 603 (citing Federaci n de Empleados del Tribunal Gen. de ____________________________________________ Justicia v. Torres, 747 F.2d 35, 36 (1st Cir. 1984) (Breyer, ________ ______ J.)). The district court is then "freed from the usual constraints that attend the adjudication of summary judgment motions," and may engage in a certain amount of factfinding, including the drawing of inferences. Id. __ By the same token, the appellate court may assume that the parties considered the matter to have been submitted to the district court as a case ready for decision on the merits. Id. __ The standard for appellate review consequently shifts from de __ novo review to clear-error review; that is, the district court's ____ -6- factual inferences should be set aside only if they are clearly erroneous. Id. (citing United States v. Ven-Fuel, Inc., 758 F.2d __ _____________ ______________ 741, 744 n.1 (1st Cir. 1985)). In the instant case, the parties cross-moved for summary judgment, yet both agreed that there was no dispute over the basic facts of the case.2 Nor did either party give any indication that it intended to present additional evidence or witnesses, or request a jury trial. The only dispute in the case stems from the inferences that the parties claim must be drawn from those basic facts -- what legal significance should be ascribed to those facts. In effect, therefore, the parties submitted their case to the district court as a case stated. See ___ Steamship Clerks, 48 F.3d at 603 (holding same in virtually _________________ identical procedural circumstances). Similarly, the parties both state in their appeal briefs and during oral argument that they agree upon the basic material facts of the case. Accordingly, we are bound to apply the more deferential clear-error standard of review when examining the inferences drawn by the district court. Id. The district court's legal conclusions nevertheless engender __  ____________________ 2 Of course, the mere fact that the parties moved simultaneously for summary judgment does not automatically change the district court's analysis or render the customary standard of appellate review obsolete. Unless the special circumstances described here are present, "the nisi prius court must consider each motion ____ _____ separately, drawing inferences against each movant in turn, and the court of appeals must engage in de novo review." Steamship __ ____ _________ Clerks, 48 F.3d at 603 n.8 (citing El D a, Inc. v. Hern ndez ______ _____________ _________ Col n, 963 F.2d 488, 492 n.4 (1st Cir. 1992); Griggs-Ryan v. _____ ___________ Smith, 904 F.2d 112, 115 (1st Cir. 1990)).  _____ -7- de novo review. Id. (citing McCarthy v. Azure, 22 F.3d 351, 354 __ ____ __ ________ _____ (1st Cir. 1994)). B. The District Court's Decision B. The District Court's Decision _____________________________ The Unions' primary contention on appeal is that the district court erred as a matter of law, and that its ruling is contrary to the Supreme Court's decision in Retail Clerks ______________ Internat'l Ass'n Local 128 v. Lion Dry Goods, 369 U.S. 17 (1962). __________________________ ______________ Specifically, the Unions argue that the Lion Dry Goods decision _______________ compels the legal conclusion that the recall agreement in the instant case is an enforceable contract. We think that the Unions' argument ascribes too much to the Lion Dry Goods case and ______________ too little to the district court's decision here. In addressing the issue of whether the recall agreement survived the Unions' decertification, the district court began by noting that "decertification ends the enforceability of any collective bargaining agreement," and observing that both parties concede that the Company is no longer obliged to negotiate or bargain with the Unions or to honor the terms and conditions of the previous collective bargaining agreements. Going on to discuss the issue of the recall agreement's continued viability, the court explained: [The recall agreement was] [d]rafted at a time when the Unions were still certified as majority bargaining representatives, [and] it requires that the Unions receive a copy of any recall notice sent to unreinstated strikers. The recall contract establishes rights for this category of represented -8- employees and affects their seniority. Indeed, it specifies that its terms are to prevail if there is any conflict with "the other provisions of the labor agreement" . . . . Thus, the recall __________________ agreement is tied directly to the _________________________________________ collective bargaining agreement: it __________________________________ supersedes or amends any conflicting portions of the collective bargaining agreement; it affects seniority rights under the collective bargaining agreement; and its notice requirement contemplates ongoing union involvement. To say that this contract survives, then, would affect any negotiations with a new union that might seek to represent a majority of International Paper employees and in the meantime would perpetuate a limited portion of the elements ordinarily covered by a collective bargaining agreement . . . . The conclusion is therefore unavoidable that this recall and seniority contract does not survive decertification. I do not need to decide whether a ______________________________________ company and a union can ever make an _________________________________________ agreement that will be enforceable after _________________________________________ a decertification. Here, there is no _________________________________________ indication in the recall agreement that _________________________________________ the parties intended it to survive _________________________________________ decertification . . . . I conclude that _______________ on the undisputed record the recall agreement became unenforceable upon decertification of the Unions. (Emphasis added)(footnotes omitted). In a footnote to this discussion, the district court noted that Lion Dry Goods ________________ "suggests that contracts with minority unions may be enforceable, but the only matter actually decided there was that jurisdiction existed under 301 [of the LMRA]." We agree with the district court that Lion Dry Goods is ______________ not dispositive of the issue in the instant case. Our reading of that case indicates that the Supreme Court was only addressing -9- the narrow issue of whether a strike settlement agreement between a minority union and an employer constitutes a "contract" as that term is employed in 301(a) of the LMRA, 29 U.S.C. 185(a). Lion Dry Goods, 369 U.S. at 27. Reasoning that the language, _______________ purpose, and legislative history of the statute do not support the exclusion of such agreements from the purview of 301(a), id. at 26-28, the Court held that claims for alleged violations __ of such agreements are "cognizable" under 301(a). Id. at 29- __ 30.3 The parties in the instant case disagree over the scope of the Court's holding in Lion Dry Goods; the Company contends ______________ that it is merely a grant of jurisdiction, while the Unions contend that it stands for the proposition that contracts between unions and employers remain enforceable even after the union has lost its majority representative status. We need not resolve this dispute, however. Even assuming arguendo that Lion Dry Goods holds, as the Unions claim, ________ ______________ that contracts between unions and employers are enforceable after decertification, it cannot by any stretch be said to require that all such contracts must be enforced regardless of the intentions ____ ____________________________ of the parties to the contract. Indeed, the district court did ______________________________ not hold that recall agreements were as a general matter unenforceable after decertification. It merely analyzed the  ____________________ 3 In so holding, the Court rejected arguments that the language of 301 contemplated only those contracts between employers and unions representing a majority of employees, explaining that the language and history of the statute did not support such a narrow construction. Id. at 28-29. __ -10- agreement before it, and inferred from the undisputed facts that the agreement had not been intended to survive decertification. ________ The Lion Dry Goods case, regardless of the scope of its holding, ______________ is therefore inapposite, and the Unions' reliance on it misplaced.4 Having disposed of this argument, we are left only with the Unions' contentions that the district court drew impermissible inferences in concluding, based on the undisputed factual record before it, that the parties did not intend the recall agreement to survive decertification. As we explained supra, however, we review these inferences only for clear error. _____ After carefully examining the record, we can discern no such clear error on the part of the district court. The Unions challenge the district court's finding that the recall agreement contemplated an "ongoing relationship" between the parties and therefore could not have been intended to  ____________________ 4 Contrary to the Unions' arguments, the district court's decision did not hinge on the fact that the Unions no longer had majority representative status. Rather, the court explained that because it found that the recall agreement, by its very terms, was "tied directly" to the unenforceable collective bargaining agreement, it had not been intended to survive the Unions' decertification. In other words, the court's decision rested not on the status of the Unions, but upon indicia of the parties' intentions in negotiating the agreement. We also reject the Unions' arguments that the district court's concern that the recall agreement would affect a successor union's ability to represent Company employees is "ill-founded" in light of the Lion Dry Goods case. The parties in Lion Dry ______________ _________ Goods explicitly agreed that their contract would have effect _____ _________________ even after the Union lost its majority representative status, 369 U.S. at 22-23, a crucial fact markedly absent in the instant case. -11- remain in effect after the Unions' decertification. The Unions concede that the provisions cited by the district court are characterized accurately; the Unions urge, however, that "it could just as equally be said" that the agreement was intended to survive decertification. The Unions offer no facts or evidence in support of this argument, nor do they claim that this actually was the parties' intent. They also do not indicate how the district court's inference was unreasonable or erroneous; they merely claim that the opposite conclusion could have been made in _____ interpreting the agreement. We think that the district court's inferences based on the undisputed record were well-supported and reasonable. We certainly cannot say that they rise to the level of clear error, so we must reject the Unions' argument on this score. Similarly, we are not persuaded by the Unions' argument that the district court erred in concluding that the absence of an expiration date in the agreement, among other indicia, supported the inference that it was not intended to survive decertification. We agree that the absence of an expiration date could be interpreted to mean that the parties intended the _____ agreement to remain in effect until all employees' recall rights were exhausted, regardless of the Unions' representative status. We do not see, however, nor do the Unions point to, any reason that the district court's conclusion to the contrary was unreasonable. The decertification petition was pending throughout the parties' negotiations, and neither party could -12- have accurately predicted when it would take place. Certainly, if the Unions had intended for the recall agreement to survive their possible decertification, they could have bargained for such a provision. We think that the absence of such a provision or expiration date, under these circumstances, just as reasonably supports the inference that the parties had not intended the ___ agreement to survive. We therefore find no error in the district court's conclusion to this effect. CONCLUSION CONCLUSION Finding no clear error, we affirm. ______ -13-