# United States Court of Appeals
## For the First Circuit

No. 20-1950

JOHN DOE, by his Mother and Next Friend, JANE DOE; B.B., by his
Mother and Next Friend, JANE BLOGGS,

Plaintiffs, Appellants,

v.

HOPKINTON PUBLIC SCHOOLS,

Defendant, Appellee,

CAROL CAVANAUGH, in her individual capacity and official
capacity as Superintendent of the Hopkinton Public Schools; EVAN
BISHOP, in his individual capacity and official capacity as
Principal of Hopkinton High School,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Alexandra H. Deal and Jeffrey P. Wiesner, with whom Jennifer
McKinnon, Paik, Brewington & Deal LLP, and Wiesner McKinnon LLP
were on brief, for appellants.
William G. Creeley, Seth B. Orkand, and Robinson & Cole LLP
on brief for Foundation for Individual Rights in Education, amicus
curiae.
Sophia Cope and Naomi Gilens on brief for Electronic Frontier

Foundation, amicus curiae.

Elizabeth F. Toner and Joshua R. Coleman, with whom Murphy, Lamere & Murphy, P.C. was on brief, for appellees.

Maura Healey, Attorney General, Abrisham Eshghi, Douglas Martland, and Joshua Olszewski-Jubelirer, Assistant Attorneys General, on brief for the Commonwealth of Massachusetts, amicus curiae.

Francisco M. Negrón, Jr., John Foskett, and Valerio, Dominello, & Hillman LLC on brief for National School Boards Association, Maine School Boards Association, Massachusetts Association of School Committees, New Hampshire School Boards Association, and Rhode Island Association of School Committees, amici curiae.

Patience Crozier and Bennett Klein on brief for GLBTQ Legal Advocates & Defenders and Anti-Defamation League, amici curiae.

Ruth A. Bourquin, Rachel E. Davidson, Rebecca R. Krumholz, and Matthew R. Segal on brief for the American Civil Liberties Union of Massachusetts, amicus curiae.

Nicolas Y. Riley and Institute for Constitutional Advocacy & Protection on brief for Professor Daniel B. Rice, amicus curiae.

—————————

November 19, 2021

—————————

**LYNCH**, **Circuit Judge**.  After an investigation, Hopkinton High School ("School"), a part of the Hopkinton Public Schools, found that eight students on the school hockey team, including plaintiffs/appellants John Doe and Ben Bloggs, had bullied their fellow hockey team member Robert Roe.[1]  The School disciplined all eight students involved in the bullying.  Doe was suspended for three days, and Bloggs was suspended for five days.

Of the disciplined students, Doe and Bloggs chose to sue in federal court challenging the constitutionality of their discipline.  They argued that they were exercising their First Amendment rights and that the causal connection between their conduct and the admitted bullying was insufficient.  They further argued that the "emotional harm" prong of Mass. Gen. Laws ch. 71, § 37O is unconstitutional.  They also argued that the punishment violated state law, specifically their student speech rights guaranteed under Mass. Gen. Laws ch. 71, § 82.

On cross motions for summary judgment, the parties agreed to proceed on a case stated basis.  The district court rejected Doe's and Bloggs's claims and entered judgment in favor of Hopkinton Public Schools on all counts.  See Doe v. Hopkinton Pub. Schs., 490 F. Supp. 3d 448, 470 (D. Mass. 2020).

---

[1]  John Doe, Ben Bloggs, Robert Roe, and other references to students are pseudonyms agreed to by the parties.  The district court granted the plaintiffs permission to proceed pseudonymously.

We affirm.

**I.**

We describe the relevant facts supported by the record. At the time of the disciplinary investigation, plaintiffs Doe and Bloggs were tenth-grade students at the School. Roe was a ninth-grade student. Doe, Bloggs, and Roe were members of the School's hockey team during the 2018-2019 season.

A.   Facts

On February 4, 2019, Roe's father filed a bullying complaint alleging that another high school student and member of the hockey team, Student 1, had been bullying Roe. The written complaint was filed on the School's standard bullying complaint form. The complaint stated that Roe had observed Student 1 video-recording him without his consent on multiple occasions and that those video recordings had been circulated amongst other students. The complaint further stated that Roe's parents had previously reported Student 1 to the high school hockey coach in December 2018 for taking photos of Roe in the locker room without his consent. Despite the prior complaint in December 2018, Student 1 had continued to take photos and videos of Roe without his permission. The complaint also listed three other members of the hockey team as witnesses but not Doe or Bloggs.

With the complaint, Roe's parents contemporaneously emailed School administrators, providing more specific information

- 4 -

about the bullying but acknowledging that they did not have complete information. They stated that Student 1 had been video-recording and photographing Roe without his permission. The bullying was furthered by the fact that these video recordings and photographs were circulated in a group chat. They stated that this bullying had created a hostile environment for Roe and had impacted his personal rights and well-being. Roe's parents reported that they believed other students on the team were involved in bullying Roe and that other team members were part of the group chat engaged in the bullying. Roe's parents filed the bullying complaint on the Monday after a weekend incident during which Student 1 had filmed Roe without his consent on the hockey team bus. Roe's parents also referenced the December 2018 complaint to the hockey coach and their understanding that this conduct was not an isolated event but a pattern of repeated bullying. Roe's parents asked that Roe be moved out of the physics class in which two of the bullies were present.

Upon receipt of the bullying complaint, the School promptly investigated the allegations as it was obligated to under the Hopkinton School Committee Policy on Bullying Prevention & Intervention ("Hopkinton Bullying Policy"). Massachusetts state law requires the School to have a bullying policy, and the Hopkinton Bullying Policy uses nearly the same definition of "Bullying" as that in the Massachusetts anti-bullying statute.

See Mass. Gen. Laws ch. 71, §§ 37H & 37O.  The Hopkinton Bullying Policy is available on the School's website and is distributed in the Student Handbook, which must be signed by students' parents or guardians every school year.  The Hopkinton Bullying Policy defines "Bullying" as:[2]

> the repeated use by one or more students or by a member of a school staff of a written, verbal, or electronic expression, or a physical act or gesture, or any combination thereof, directed at a target that:
> - causes physical or emotional harm to the target or damage to the target's property;
> - places the target in reasonable fear of harm to him/herself, or of damage to his/her property;

---

[2]  Massachusetts state law defines "Bullying" as:

> the repeated use by one or more students or by a member of a school staff including, but not limited to, an educator, administrator, school nurse, cafeteria worker, custodian, bus driver, athletic coach, advisor to an extracurricular activity or paraprofessional of a written, verbal or electronic expression or a physical act or gesture or any combination thereof, directed at a victim that: (i) causes physical or emotional harm to the victim or damage to the victim's property; (ii) places the victim in reasonable fear of harm to himself or of damage to his property; (iii) creates a hostile environment at school for the victim; (iv) infringes on the rights of the victim at school; or (v) materially and substantially disrupts the education process or the orderly operation of a school. For the purposes of this section, bullying shall include cyber-bullying.

Mass. Gen. Laws ch. 71, § 37O.

- creates a hostile environment at school for the target;
- infringes on the rights of the target at school; or
- materially and substantially disrupts the education process or the orderly operation of a school.

Pursuant to the Hopkinton Bullying Policy, Josh Hanna and Justin Pominville, assistant principals at the School, conducted the investigation into the bullying.[3]

The investigation covered the various means of bullying, including Roe's own reports of exclusion and feeling bullied, the surreptitious audio- and video-recording and photographing of Roe, the unauthorized sharing of photographs of Roe and his family, the isolating of Roe, and the group communications between the members of the hockey team bullying Roe. Hanna and Pominville met with Roe's parents and Roe. They interviewed ten other members of the hockey team, starting with those initially named in the bullying complaint. Hanna and Pominville also met with law enforcement. The School's athletic director interviewed the hockey coach.

We recount the general course of the investigation and relevant factual findings made by Hanna and Pominville in the School's Bullying Investigation Report ("Bullying Report").

---

[3] Doe and Bloggs do not allege bias on the part of Hanna and Pominville. Neither Hanna nor Pominville was listed as a defendant in Doe's and Bloggs's lawsuits.

During his interview, Roe stated that he was actively excluded at hockey team spaghetti dinners and on the team bus. He reported that other team members whispered about him and looked at him. He stated that as a result, he became aware of the existence of the Snapchat group, which was discussed in front of him. Roe told the investigators that the bullying included sneaking photos and videos of him without his permission and sharing those photos and videos of him in the group. He reported that he felt alone on the hockey team bus and at hockey team events. Roe named four students whose bullying had been evident to him: Student 1, Student 3, Student 5, and Student 6. Roe reported that Student 1 had attempted to get him to say "I am gay" and "dick" while audio- and video-recording him.

Hanna interviewed Student 2, one of the students listed as a witness in the bullying complaint. Student 2 stated that there was a Snapchat group composed of members of the hockey team.[4] Student 2 gave his phone to Hanna to view. Upon viewing, Hanna

---

[4] Snapchat is a social media application, which allows users to share and edit photos, videos, and messages. Snapchat servers automatically delete group photos, videos, and messages after 24 hours. See When Does Snapchat Delete Snaps and Chats?, Snapchat.com, https://support.snapchat.com/en-US/article/when-are-snaps-chats-deleted (last visited Sept. 10, 2021). Snapchat users can take active steps to save a photo, video, or message at any point. If a user saves a group photo, video, or message, it remains available to all members of the Snapchat group. See id.

saw videos, photos, and messages, not yet deleted, communicated by and among the Snapchat group members, including Doe and Bloggs.

Hanna and Pominville viewed and preserved the photos, videos, and messages in the Snapchat group that had been saved or not yet deleted. Hanna learned from those messages that eight members of the Hopkinton hockey team were members of the group: Student 1, Student 2, Student 3, Student 4, Student 5, Student 6, Doe, and Bloggs. The members of the group confirmed as true Roe's statement that he had been excluded from the Snapchat group. The group was named "Geoff Da Man."[5] Bloggs told the investigators that the Snapchat group had been created in December 2018. The group continued until it was broken up when the discipline was imposed. The School maintains that the group would have continued absent that discipline. The Snapchat postings were composed not only of messages from members of the group but also videos and photos of Roe taken without his consent, dating back to at least January 19, 2019, and circulated among the members.

The preserved Snapchat messages included demeaning and expletive-laced comments regarding Roe's appearance, voice, intimate anatomy, parents, and grandmother. Doe and Bloggs each received these ongoing exchanges and responded to them. They each

---

[5] The Snapchat group was named after a tenth student, Student 10, who was also excluded from the group. Roe, Student 10, and the eight members of the Snapchat group shared a locker room together.

joined in these exchanges and sent derogatory messages about Roe in response to photos and messages from other students. For instance, in one exchange, Bloggs initiated a series of group messages about Roe's family members:

> Bloggs: "Was [Roe]'s grandma in the third row"
> Student 2: "They tied her to the hood"
> Bloggs: "With bungee cords?"
> . . .
> Bloggs: "Are [Roe]'s parents ugly too [o]r did he just get bad genes"

In response, Student 3 found photos of Roe's parents and shared those photos with the Snapchat group. Bloggs then responded to the photos:

> Bloggs: "A family of absolute beauties"

Student 5 also posted a different photo of Roe that had been surreptitiously taken without his consent. In response to that photo, Doe and Bloggs both messaged the group:

> Doe: "[Student 5] and [Roe] were made on the same day[.] [Student 5] was the starting product and [Roe] is what it turned into[,] kinda like a game of telephone in 1st grade"
> Bloggs: "[Roe]'s leather shampoo makes up for the looks though"

Bloggs, in addition, disclosed to the group without Roe's authorization one of Roe's online usernames.

On February 8, 2019, Hanna and Pominville concluded their investigation and forwarded the nine-page Bullying Report to the School's principal and the school district's superintendent.

Hanna and Pominville considered the interviews, the screenshots and videos from the Snapchat group, and the written complaint submitted by Roe's father in arriving at their findings. The Bullying Report included summaries from interviews with ten individuals: the eight members of the Snapchat group, Roe, and the hockey coach.[6] In addition to the facts described earlier, the Bullying Report made additional specific findings. Student 1 stated, "we pick on [Roe]," and Student 2 stated that Roe was "targeted." Student 5 stated that the intent was to "laugh[] at [Roe]" and apologized for his conduct.

The Bullying Report concluded, based on the investigation and Doe's and Bloggs's interviews, that they were aware of, joined, participated in, and encouraged the bullying. When asked if he had a sense that the students' conduct was not appropriate, Doe responded, "Yes, I said something but not to the point to end it." He also stated that he understood the conduct was harassment.

Bloggs acknowledged that Roe was shy "so some people take pictures and make fun of him." On February 4, 2019, after he was interviewed, Bloggs sent an email to the hockey coach

_____

[6] Hanna and Pominville also interviewed Student 10 and another witness, but the summaries of these two interviews were not included in the Bullying Report.

- 11 -

apologizing for his conduct and stated, "I should have taken more of a serious role in preventing anything else from happening."

The Bullying Report found that each of the eight students "was an active participant in the SnapChat group" and that the "[s]tudents admitted that [Roe] was excluded from Snapchat." The Bullying Report detailed other activities by group members when it stated:

> 4. The SnapChat group included:
> a. Photos of [Roe] taken without his consent
> b. Videos of [Roe] taken and posted without his consent
> c. Photos of [Roe's] parents with disparaging comments on their appearance
> d. Disparaging comments regarding [Roe's] appearance, voice, and anatomy
> e. Attempts to get [Roe] to say inappropriate statements and record him doing this

The Bullying Report noted that the students admitted to "taking videos and photos while on bus rides to away hockey games and while at team gatherings."

The Bullying Report concluded that "[t]here was a preponderance of the evidence showing that the 8 students bullied and harassed [Roe]" as defined by the Hopkinton Bullying Policy. The Bullying Report found that "[t]he conduct caused emotional harm to [Roe], created a hostile environment for him during school-sponsored events and activities and infringed on his rights at school" in violation of the first, third, and fourth prongs of the

- 12 -

Hopkinton Bullying Policy and section 37O. The School suspended all eight members of the Snapchat group from the hockey team for the remainder of the 2018-2019 season.

On February 12, 2019, School principal Evan Bishop held individualized suspension hearings for each of the eight students, including Doe and Bloggs. The students' parents were invited to the disciplinary hearings. These individualized hearings constituted each "student's opportunity to provide [his] side of the story and to dispute the allegations."

After the individual hearings, Bishop found that Doe "made a disparaging comment regarding [Roe's] appearance." He identified "[r]eports of additional videos and photos taken of [Roe] throughout the season that have not been retained" on Snapchat. He issued Doe a three-day suspension after the findings.

Bishop found that Bloggs participated in "[p]osting photos of [Roe] without his consent," "[p]osting comments of [Roe's] parents with disparaging comments on their appearance," and "posting of disparaging comments regarding [Roe's] appearance." Bishop also identified "[r]eports of additional videos and photos taken of [Roe] throughout the season that have not been retained" on Snapchat. He issued Bloggs a five-day suspension.[7]

_____

[7] Given the short length of the suspensions, the disciplinary process ended with principal Bishop, and there was no

After the bullying, Roe obtained counseling from the School's student therapeutic academy resource team, declined to try out for the lacrosse team in the spring, and entered formal mental health treatment. At the end of the 2018-2019 academic year, Roe left the School to attend school in Quebec, Canada.

B. Procedural History

On August 16, 2019, Doe, by and through his mother Jane Doe, filed an amended complaint in federal court alleging Hopkinton Public Schools and its administrators violated his rights to free speech and association under state and federal law. Doe also requested a declaration that the "emotional harm" prongs of Hopkinton's Bullying Policy and the enabling Massachusetts anti-bullying statute, Mass. Gen. Laws ch. 71, §§ 37H & 37O, are unconstitutionally overbroad and vague. On September 19, 2019, Bloggs, by and through his mother Jane Bloggs, filed a complaint in federal court alleging similar causes of action. On February 5, 2020, the district court consolidated Doe's case with Bloggs's case.

The parties cross-moved for summary judgment. On June 29, 2020, during the summary judgment hearing, the parties agreed to proceed on a case stated basis. Doe, 490 F. Supp. 3d at

---

appeal to the School's superintendent, who did not play a role in the disciplinary process. Nonetheless, superintendent Carol Cavanaugh was named as a defendant in her individual and official capacities in Doe's and Bloggs's complaints.

453. In a case stated decision "the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record." TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007). "The court is then entitled to 'engage in a certain amount of factfinding, including the drawing of inferences.'" Id. (quoting United Paperworkers Int'l Union Loc. 14 v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)). On September 22, 2020, the court issued its Findings of Fact and Rulings of Law.

The court found that the factual conclusions in the Bullying Report were well-supported in the record. Doe, 490 F. Supp. 3d at 456. As to the argument that the imposition of the discipline violated the First Amendment rights of Doe and Bloggs, the court ruled in favor of Hopkinton Public Schools on Doe's and Bloggs's challenges. It held that the School's discipline under its bullying policy and Massachusetts state law did not violate Doe's and Bloggs's First Amendment rights to speech and/or association. The court reviewed the Supreme Court's decision in Tinker v. Des Moines Independent School District, 393 U.S. 503 (1969), and its holding that speech "may be regulated only if it would substantially disrupt school operations or interfere with the right of others." Doe, 490 F. Supp. 3d at 457 (quoting Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 214 (3d Cir. 2001)). The court found that:

- 15 -

the Students' messages did not take place in isolation; the students in "Geoff da Man" were engaging in bullying. A reasonable official could have found that Roe did suffer from the speech and actions of the members of the hockey team, coordinated through the Snapchat group. This "repeated" conduct and speech "by one or more students" was "directed" at Roe, causing him "emotional . . . harm." Mass. Gen. Laws ch. 71, § 37O. A reasonable official could have found this bullying was "severe or pervasive." Norris, 969 F.3d at 29 n.18. This bullying therefore constituted an infringement of Roe's rights and is not protected by Tinker whether or not it caused a substantial disruption. Id. at 29.

Doe, 490 F. Supp. 3d at 461. The court found that "[a] reasonable official could have found Doe and Bloggs to be participants in group bullying that invaded Roe's rights." Id. at 465.

Doe and Bloggs contended that there was a lack of causality between their actions and the bullying and that they were thus being subjected to "guilt by association." See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 918-19 (1982); see also Humanitarian L. Project v. U.S. Dep't of Treasury, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006). The district court rejected those arguments, reasoning that "th[o]se precedents do not require school officials to ignore the group context in which Doe's and Bloggs' comments were made" and finding Doe and Bloggs "did not merely 'associate' in the Snapchat but were active -- albeit minor -- participants in the group targeting of Roe." Doe, 490 F. Supp. 3d at 463. The court cited to similar cases in which federal

courts had rejected the lack of causality argument.  Id. at 463-64; see Taylor v. Metuchen Pub. Sch. Dist., No. 18-cv-1842, 2019 WL 1418124, at *5-6 (D.N.J. Mar. 28, 2019); Shen v. Albany Unified Sch. Dist., Nos. 3:17-cv-02478, 3:17-cv-02767, 3:17-cv-03418, 3:17-cv-03657, 2017 WL 5890089, at *9-10 (N.D. Cal. Nov. 29, 2017).

After discussing those cases, the court made further findings:

> A reasonable official could conclude that both Doe and Bloggs made derogatory comments about Roe in the group conversation.  That official could easily find that Bloggs' comment about the "game of telephone," amidst a litany of insults against Roe's appearance, was not innocuous.  Snapchat Screenshots PO000036.  Doe's messages speak for themselves. Id. at PO000034-36.  Thus an official could find that by posting these comments -- even if they were themselves minor relative to the surrounding nastiness -- Doe and Bloggs had signaled their approval and encouragement of the bullying by the other hockey teams members.  Their punishment would not have been constitutional under the First Amendment if they were merely members of the Snapchat group, cf. Shen, 2017 WL 5890089, at *9-10, but by actively encouraging the group bullying, they could be permissibly disciplined for its results.
>
> This conclusion is consistent with the causality analysis in Norris.  In Norris, "[t]he defendants do not assert that A.M. directly participated in the bullying of Student 1 at school, or that she was responsible for the video or any of the rumors being circulated about Student 1."  969 F.3d at 31.  Here, Doe and Bloggs were participants in the bullying.  This Court is persuaded by Shen that the proper inquiry is whether the group caused an invasion of Roe's rights and whether Doe and Bloggs participated in the

- 17 -

group by encouraging its behavior. 2017 WL 5890089, at *9-10. A reasonable official could have found these facts, and these reasons align with the schools' explanations at the time. See Doe Suspension, Bloggs Suspension.

Lastly, the Massachusetts law contemplates discipline of collective action. Section 37O defines bullying as action "by one or more students . . . directed at a victim" that cause the listed harms. Mass. Gen. Laws. ch. 71, § 37O. If the isolated conduct of each student in the group had to individually meet all the elements of "bullying," the words "or more" in the statute would be read out. Children often bully as a group. The children who stand on the sidewalk and cheer as one of their friends shakes down a smaller student for his lunch money may not be as culpable, but they are not entirely blameless. Similarly, the "Geoff Da Man" group's conduct as a whole was directed at Roe, and Massachusetts law allows School officials to consider Doe and Bloggs as members of that group.

Doe, 490 F. Supp. 3d at 464-65.

The court also ruled that the "emotional harm" prong of section 37O and the Hopkinton Bullying Policy is neither overbroad nor vague. Id. at 465-69. Lastly, the court ruled that Hopkinton Public Schools did not violate Mass. Gen. Laws ch. 71, § 82. Id. at 470.

Doe and Bloggs timely appealed.[8]

---

[8] We acknowledge the amici curiae for their submissions in this matter. The following amici submitted briefs in support of Doe and Bloggs: the Foundation for Individual Rights in Education and the Electronic Frontier Foundation. The following amici submitted briefs in support of Hopkinton Public Schools: the

- 18 -

**II.**

A.   Standard of Review

We review the district court's legal conclusions de novo. See United Paperworkers, 64 F.3d at 32. In a case stated decision, "the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record." TLT Constr. Corp., 484 F.3d at 135 n.6. We review the district court's factual findings and inferences for clear error. United Paperworkers, 64 F.3d at 31.

B.   The School Did Not Violate Doe's and Bloggs's First Amendment Rights.

To prevail on a First Amendment claim under 42 U.S.C. § 1983, Doe and Bloggs bear the burden of showing that (1) they were engaged in constitutionally protected conduct, (2) they were subjected to adverse actions by the School, and (3) the protected conduct was a substantial or motivating factor in the adverse actions. See D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012). The parties do not dispute that the second

Commonwealth of Massachusetts; the National School Boards Association, Maine School Boards Association, Massachusetts Association of School Committees, New Hampshire School Boards Association, and Rhode Island Association of School Committees; and GLBTQ Legal Advocates & Defenders and the Anti-Defamation League. The following amici submitted briefs in support of neither party: Daniel B. Rice and the American Civil Liberties Union of Massachusetts.

and third requirements have been satisfied.  We thus focus our analysis on the first requirement.

Doe and Bloggs contend that the School violated their First Amendment rights to speech and association by punishing them for what they call their "private messages" that they sent to their friends over the Snapchat platform.  They primarily argue that the court's finding that there was a causal relationship between their participation in the group and each of the three reasons given by the school for imposition of the discipline was clear error.

1.    The School's Decisions Regarding Student Speech and Bullying Are Entitled to Deference.

The School's findings that Doe and Bloggs violated school policy and the Massachusetts anti-bullying statute are entitled to deference if they are reasonable.[9]  The Supreme Court

---

[9]    The amicus brief submitted by the American Civil Liberties Union ("ACLU") of Massachusetts argues that the district court's textual reading of the Massachusetts anti-bullying statute was erroneous.  The ACLU argues that the district court erroneously read the statute expansively to encompass a theory of group bullying.  Doe and Bloggs thus could not be disciplined under the statute as a matter of law based on the district court's factual findings.

We do not address this argument because Doe and Bloggs did not plead that the School exceeded its authority under the Massachusetts anti-bullying statute, nor did they raise this argument on appeal.  We do not consider an argument raised by amicus curiae where the "argument was not raised by the parties or passed on by the lower court[]."  FTC v. Phoebe Putney Health Sys., Inc., 568 U.S. 216, 226 n.4 (2013); see Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 467 (1st Cir. 2009).  The ACLU also does not argue that the School could not act beyond the authority of the Massachusetts anti-bullying statute as long as it did not violate the constitutional

has long held that schools have a special interest in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." Tinker, 393 U.S. at 513. "Courts generally defer to school administrators' decisions regarding student speech so long as their judgment is reasonable." Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 30 (1st Cir. 2020); see Morse v. Frederick, 551 U.S. 393, 403 (2007) ("Tinker held that student expression may not be suppressed unless school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" (quoting Tinker, 393 U.S. at 513)); Hazelwood Sch. Dist. v. Khulmeier, 484 U.S. 260, 273 (1988); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683 (1986) ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."); Norris, 969 F.3d at 29 n.18 ("[S]chool administrators must be permitted to exercise discretion in determining when certain speech crosses the line from merely offensive to more severe or pervasive bullying or harassment.").

At the time of the imposition of the discipline, the School provided three justifications for Doe's and Bloggs's suspensions and does not vary from those justifications in this

protections of the First Amendment.

litigation.  Cf. Norris, 969 F.3d at 25-26 (requiring school administrators to adhere to rationale provided at time of discipline in litigation defending discipline).  The School determined that Doe's and Bloggs's "conduct [1] caused emotional harm to [Roe], [2] created a hostile environment for him during school-sponsored events and activities and [3] infringed on his rights at school."

Tinker holds that schools have a special interest in regulating speech that involves the "invasion of the rights of others."  Tinker, 393 U.S. at 513.  The Supreme Court made clear in Mahanoy Area School District v. B.L. ex rel. Levy that schools have a significant interest in regulating "serious or severe bullying or harassment" that invades the rights of others.[10]  141 S. Ct. 2038, 2045 (2021).  This pedagogical interest remains even in off-campus circumstances.[11]  In Mahanoy Area School District,

---

[10]    The amicus brief submitted by the GLBTQ Legal Advocates & Defenders and the Anti-Defamation League cites to social science research showing that bullying is an extensive and pervasive problem amongst adolescents.  The Centers for Disease Control and Prevention has concluded that a considerable number of youth are bullied.  See Gladden et al., Ctrs. for Disease Control & Prevention, Bullying Surveillance Among Youths: Uniform Definitions for Public Health and Recommended Data Elements (1st ed. 2014).  National surveys estimate that anywhere from 11% to 28% of adolescents are victims of bullying.  Id. at 5.

[11]    There is no merit to Doe and Bloggs's argument that their speech is not subject to punishment because it did not occur on campus.  In Mahanoy Area School District, the Supreme Court rejected the Third Circuit's on-campus/off-campus speech distinction. 141 S. Ct. at 2045.  Instead, the Supreme Court held that "[t]he school's regulatory interests remain significant in

- 22 -

B.L. was disciplined for off-campus Snapchat posts, which were not directed at any individual. The Supreme Court found that the speech was more accurately characterized as "criticism of the rules of a community of which B.L. forms a part," id. at 2046, and that it did not satisfy the "substantial disruption" prong of Tinker, id. at 2047-48. A general statement of discontent is vastly and qualitatively different from bullying that targets and invades the rights of an individual student. See Mahanoy Area Sch. Dist., 141 S. Ct. at 2045; Norris, 969 F.3d at 29 ("[B]ullying is the type of conduct that implicates the governmental interest in protecting against the invasion of the rights of others, as described in Tinker.").

2.   Doe's and Bloggs's Speech and Conduct Are Not Protected by the First Amendment.

Doe and Bloggs contend that their speech and conduct were protected by the First Amendment and could not be disciplined

---

some off-campus circumstances. . . . These include serious or severe bullying or harassment targeting particular individuals. . . ." Id.

Further, the School found that Doe's and Bloggs's speech and conduct occurred both on campus and off campus and took place during school-affiliated events. The district court agreed and did not clearly err in this factual determination. Doe, 490 F. Supp. 3d at 463. The students admitted to taking videos and photos while in the locker room, on bus rides to school hockey games, and at team gatherings. Doe's and Bloggs's speech and conduct were thus unlike B.L.'s Snapchat message that was posted on her own time outside of school at a convenience store. See Mahanoy Area Sch. Dist., 141 S. Ct. at 2043.

- 23 -

by the School. They argue that they were punished solely for sending messages over Snapchat and participating in the Snapchat group -- and that they engaged in no offending conduct directed towards Roe.

For the School to discipline Doe's and Bloggs's speech, there must be a causal connection between their speech and the bullying that invaded Roe's rights. Norris, 969 F.3d at 28, 31.[12] Doe and Bloggs do not dispute that other group members directly bullied Roe, such as by taking nonconsensual photos and videos of him, attempting to get him to say inappropriate statements on camera, and isolating him from the hockey team. They do not dispute that this bullying could be regulated consistent with the First Amendment. They challenge only whether their conduct reasonably could be viewed as a ground for treating them as active participants in such regulable conduct. As such, the relevant question is whether the School reasonably concluded that Doe's and Bloggs's messages and active participation in the group were

---

[12] The causal connection concerns from Norris are not present in Doe's and Bloggs's situations. In Norris, the plaintiff, student A.M., posted a sticky note, which read "THERE'S A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS;" it was not widely distributed or viewed by members of the school community. Norris, 969 F.3d at 14-15. The note was in the girls' bathroom for a few minutes and seen by two students. Id. at 32. Here, the School reasonably concluded that Doe's and Bloggs's messages were viewed by the members of the Snapchat group, who were all active participants in the group. In Norris, the sticky note contained several ambiguities. Included among those ambiguities was the "rapist" and whether the "rapist" was even a student. Id.

causally connected to the direct bullying because they encouraged other group members to continue bullying Roe.

As the district court stated: "Children often bully as a group. The children who stand on the sidewalk and cheer as one of their friends shakes down a smaller student for his lunch money may not be as culpable, but they are not entirely blameless." Doe, 490 F. Supp. 3d at 464-65; see e.g., Taylor, 2019 WL 1418124, at *6 (dismissing First Amendment claim where student had been punished for encouraging his friend to publish a caricature of another student on a social media website); Shen, 2017 WL 5890089, at *9 (upholding school discipline against students that "liked" or expressed approval of derogatory and racist Instagram posts that targeted specific students).[13]

Here, the School and the district court both concluded as a matter of fact that Doe's and Bloggs's speech and Snapchat participation were causally connected to the other members' bullying of Roe. That conclusion was reasonable, and we see no clear error.

_____

[13] The amicus brief submitted by the National School Boards Association, Maine School Boards Association, Massachusetts Association of School Committees, New Hampshire School Boards Association, and Rhode Island Association of School Committees cites to social science research finding that "bullying is a 'group process', and many researchers and policymakers share the belief that interventions against bullying should be targeted at the peer-group level rather than at individual bullies and victims." Salmivalli, Bullying and the Peer Group: A Review, 15 Aggression & Violent Behavior 112, 117 (2010) (citations omitted).

Doe and Bloggs both made derogatory comments about Roe in the Snapchat group conversation. Doe stated, "[Student 5] and [Roe] were made on the same day[.] [Student 5] was the starting product and [Roe] is what it turned into kinda like a game of telephone in 1st grade." Bloggs initiated an exchange about Roe's family that led another student to post photos of Roe's parents. Bloggs then made numerous derogatory comments about Roe's family members and his appearance, including "Are [Roe]'s parents ugly too [o]r did he just get bad genes" and "[Roe]'s leather shampoo makes up for [his] looks though." Bloggs also sent a photo of another student to the Snapchat group and shared with the group one of Roe's online usernames without his consent.

Importantly, as the district court noted, Doe's and Bloggs's messages demeaning Roe's appearance and family -- and their continuous, active participation in the Snapchat group -- "did not take place in isolation." Doe and Bloggs both admitted that they were aware that members of the group were bullying Roe. They were aware that members of the group were taking nonconsensual photos and videos of Roe and circulating them in the group. The Snapchat group was formed in December 2018 and continued to exist until at least the date of the investigation in early February 2019, months after Roe's parents filed their initial complaint with the hockey coach that Student 1 had taken photos and videos of Roe in the locker room without his consent. Doe and Bloggs

- 26 -

nonetheless continued to send demeaning messages about Roe and his family. They were participants in an extensive back-and-forth between the eight students that included numerous derogatory comments and nonconsensual photos and videos. The students in the Snapchat group continued to bully Roe during this time, until at least February 2, 2019, when Student 1 again attempted to video-record Roe on the hockey team bus without his consent and replayed a video of Roe on his phone in front of him -- two days before Roe's parents filed their bullying complaint.

The School reasonably concluded that Doe's and Bloggs's messages and participation in the group fostered an environment that emboldened the bullies and encouraged others in the invasion of Roe's rights. The evidence shows that they were well aware of the effects of that conduct on Roe. The School reasonably concluded that this speech and conduct itself constituted, contributed to, and encouraged the bullying.

To be sure, there may be circumstances in which encouragement is so minimal or ambiguous, the chain of communication so attenuated, or knowledge of direct bullying so lacking, that a school's punishment of certain speech would be unreasonable. See Shen, 2017 WL 5890089, at *10 (finding certain students' participation in online group containing racist content not sufficiently active to warrant punishment). The speech and conduct of the defendants in this case, though, actively and

- 27 -

extensively encouraged bullying and fostered an atmosphere where bullying was accepted. Consequently, it does not present those concerns and, thus, we have no occasion to explore those limits.

Doe and Bloggs point to a finding by the district court that "[t]here is no evidence in the record of any non-speech conduct by Bloggs or Doe directed at Roe, except for their failure to intervene when other students mistreated him, which is certainly insufficient alone to constitute bullying." Doe, 490 F. Supp. 3d at 461. But this reliance is misplaced because speech that actively encourages such direct or face-to-face bullying conduct is not constitutionally protected. Doe and Bloggs ignore the district court's further conclusion that "an official could find that by posting these comments -- even if they were themselves minor relative to the surrounding nastiness -- Doe and Bloggs had signaled their approval and encouragement of the bullying by the other hockey teams members." Id. at 464. The record supports the School's finding that Doe and Bloggs were participants in encouraging the group and its bullying of Roe, and that bullying went beyond speech and included activities such as taking nonconsensual photos and videos of Roe, attempting to get him to say inappropriate statements on camera, and isolating him from the hockey team. The district court did not clearly err in finding that Doe and Bloggs, through their active participation in the

Snapchat group, encouraged the bullying that -- they do not dispute -- others engaged in that went beyond speech.

We reject Doe and Bloggs's argument that their speech, though offensive, did not rise to the level of invading the rights of others and thus could not be disciplined under Tinker and the Massachusetts anti-bullying statute. Doe and Bloggs were not punished because Roe was offended by the content of their messages. As Doe and Bloggs themselves point out, Roe never saw the Snapchat messages from them. Doe and Bloggs were punished because the School reasonably found that their speech and participation in the Snapchat group actively encouraged the repeated bullying that occurred throughout the 2018-2019 season.

We also reject Doe and Bloggs's argument that they did not intend or expect their messages to be viewed by Roe because they expected the messages to be deleted. But there is no intent requirement under Tinker. The test under Tinker is objective, focusing on the reasonableness of the school's response, not the intent of the student. See Norris, 969 F.3d at 25; Shen, 2017 WL 5890089, at *10.

In light of the evidence in the record, the district court did not clearly err in finding that "Doe and Bloggs had signaled their approval and encouragement of the bullying by the

- 29 -

other hockey teams members." <u>Doe</u>, 490 F. Supp. 3d at 464.[14] Speech or conduct that actively and pervasively encourages bullying by others or fosters an environment in which bullying is acceptable and actually occurs -- as in this case -- is not protected under the First Amendment.

C. <u>Doe's and Bloggs's Facial Overbreadth and Vagueness Challenges to the "Emotional Harm" Prong of the School Policy and Massachusetts Statute Are Moot.</u>

Doe and Bloggs in addition seek declarations that the "emotional harm" prong of the Hopkinton Bullying Policy and section 370 are unconstitutionally vague and overbroad. They contend that these provisions have "chilled" their speech because they are open to expansive and potentially arbitrary enforcement.

Under "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." <u>United States</u> v. <u>Williams</u>, 553 U.S. 285, 292 (2008). The doctrine rests on the notion that "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech," a chilling effect that inhibits the free exchange of ideas. <u>Id.</u> The void-for-vagueness doctrine, by contrast, is derived from the Due Process Clause of

---

[14] The district court also correctly rejected Doe and Bloggs's argument that their punishments violated their First Amendment rights to free association. Doe and Bloggs were not punished for associating with other members of the hockey team. The School punished Doe and Bloggs for their conduct. They were active members of the Snapchat group and encouraged the bullying.

the Fifth Amendment and is concerned with circumstances in which a law is so vague that it does not provide fair notice of what conduct it prohibits and creates a risk of arbitrary enforcement. See Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972). Courts have long recognized that when a vague law implicates First Amendment interests, the injuries can be similar to and overlapping with those in overbreadth claims, but the analysis takes place under distinct tests. See Holder v. Humanitarian L. Project, 561 U.S. 1, 20 (2010); Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 494 (1982); see also Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.9.4 (3d ed. 2021).

Doe's and Bloggs's claims as to facial overbreadth and vagueness seek prospective relief, and they have presented no argument that these claims are integrally intertwined with their discipline claims.[15] That being so, the facial overbreadth and

_____

[15] The facial overbreadth and vagueness claims, as pleaded and argued, seek only prospective relief in the form of a declaration of rights and injunctive relief against future enforcement of the "emotional harm" prong. Doe's and Bloggs's First Amendment Tinker claims, by contrast, request injunctive relief to remove the discipline from their records. The district court understood the claims as we do.

To the extent Doe and Bloggs challenge either the Hopkinton Bullying Policy or section 37O insofar as they relate to removing the past discipline from their records, those arguments are waived. See United States v. Rodrigues, 850 F.3d 1, 13 n.6 (1st Cir. 2017).

vagueness claims as to the "emotional harm" prong of the Hopkinton Bullying Policy and section 37O are moot.

"The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." New York v. Ferber, 458 U.S. 747, 767 (1982). First Amendment overbreadth challenges are an exception to that general rule against third-party standing. See Osediacz v. City of Cranston, 414 F.3d 136, 140-41 (1st Cir. 2005); see also United States v. Smith, 945 F.3d 729, 736 (2d Cir. 2019). "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).

Even so, the overbreadth doctrine does not dispose of the requirement that a plaintiff demonstrate Article III constitutional standing. Osediacz, 414 F.3d at 141; see Serv. Emps. Int'l Union, Local 3 v. Mun. of Mt. Lebanon, 446 F.3d 419, 423 (3d Cir. 2006) ("[L]itigants [asserting a First Amendment overbreadth challenge], of course, must still meet the constitutional requirement of injury-in-fact because their own constitutionally unprotected interests will be adversely affected

- 32 -

by application of the statute." (first citing Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L. Rev. 423, 424 (1974); and then citing Fallon, Making Sense of Overbreadth, 100 Yale L.J. 853, 860 n.33 (1991))). Nor does the void-for-vagueness doctrine excuse a plaintiff from establishing the constitutional requirement of injury-in-fact as to their own interests.[16] See Holder, 561 U.S. at 20 ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (quoting Vill. of Hoffman Ests., 455 U.S. at 495) (quotation omitted)). To establish Article III standing, a plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021).

---

[16] In addition, we note that Doe and Bloggs do not challenge the third or fourth prongs that cover conduct that "creates a hostile environment at school for the target" or "infringes on the rights of the target at school." Hopkinton Bullying Policy; see Mass. Gen. L. ch. 71 § 37O. The School determined that the conduct for which discipline was imposed independently satisfied each of the three prongs of the School policy and the Massachusetts statute. Even assuming Doe and Bloggs could challenge their past discipline by challenging the "emotional harm" prong as overbroad and vague, the result would be the invalidation of the "emotional harm" prong of the Hopkinton Bullying Policy and section 37O. Doe and Bloggs would receive no relief from their injury because the School had two separate and independent grounds for finding that they engaged in bullying. See Signs for Jesus v. Town of Pembroke, N.H., 977 F.3d 93, 100-01 (1st Cir. 2020).

The plaintiff must thus show "whether the risk that the Policy will have a chilling effect on the speech of others is a sufficient injury to the plaintiff to meet the first prong of the constitutional test for standing." Osediacz, 414 F.3d at 142 (emphasis in original). "[A] chill on speech sometimes may be a cognizable injury," but "in order to have standing, the plaintiff must be within the class of persons potentially chilled." Id.

Having graduated -- and thus no longer subject to the Hopkinton Bullying Policy or section 370 -- Doe and Bloggs do not fall within the "class of persons potentially chilled." See Powell v. McCormack, 395 U.S. 486, 496 (1969) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.").

An exception to the mootness doctrine exists for cases that are "capable of repetition, yet evading review." Murphy v. Hunt, 455 U.S. 478, 482 (1982). But this exception applies only when: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party w[ill] be subjected to the same action again." Id. (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)) (emphasis added).

Doe and Bloggs fail to satisfy the second prong of the exception. They are no longer students at the School, and there is no reasonable expectation that they will be subject to the same

- 34 -

discipline again under the challenged policy and statute. See Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1225 (10th Cir. 2009) ("[T]here is no reasonable expectation that [plaintiff] will be subjected, post-graduation, to [the challenged policy]."); Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd., 336 F.3d 211, 217 (3d Cir. 2003); Cole v. Oroville Union High Sch. Dist., 228 F.3d 1092, 1098 (9th Cir. 2000).

D.    The School Did Not Violate Doe's and Bloggs's Rights Under the Massachusetts Student Speech Statute.

Doe and Bloggs further contend that the School violated their rights under Mass. Gen. Laws ch. 71, § 82, which provides in relevant part: "The right of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school." They argue that the statute protects the free speech rights of students limited only by the requirement that the speech be nondisruptive. Doe and Bloggs argue that they thus cannot be punished for speech that invaded the rights of another but was not found to "cause any disruption or disorder within the school."[17]

---

[17]   The district court correctly held that the School may not rely on the "substantial disruption" prong of Tinker to justify its actions. Doe, 490 F. Supp. 3d at 460. In Norris, we held that the school "must rely only on the reasons originally provided to A.M. for her suspension" and "may not rely on post hoc rationalizations for the speech restrictions." Norris, 969 F.3d at 25-26. Here, the Bullying Report found that Doe's and Bloggs's

- 35 -

Doe and Bloggs ask us to interpret section 82 in a manner that directly conflicts with the plain text of the later-enacted Massachusetts anti-bullying statute. When Massachusetts enacted the anti-bullying statute in 2010, it adopted the language from Tinker, and the plain text of the statute permits discipline based on "Bullying" that "infringes on the rights of the victim at school." Mass. Gen. L. ch. 71, § 370(a). If Doe and Bloggs's interpretation of section 82 were correct, entire paragraphs of section 370 would conflict directly with section 82. We do not so interpret section 82. See Town of Hadley v. Town of Amherst, 360 N.E.2d 623, 626 (Mass. 1977).

Doe and Bloggs's sole response is that the anti-bullying statute states that it does not "supersede or replace existing rights or remedies." Mass. Gen. L. ch. 71, § 370(i). But subsection 370(i) is not plausibly read to limit school discipline of bullying to the constraints provided for in section 82, as that would render much of the anti-bullying statute meaningless. Given the anti-bullying statute's focus on victims of bullying and the responsibilities of school administrators in addressing bullying, the more natural reading of subsection 370(i) is that insofar as

---

"conduct caused emotional harm to [Roe], created a hostile environment for him during school-sponsored events and activities and infringed on his rights at school." The School may rely only on these justifications for rationalizing the speech restrictions. See id.

bullying covered by section 370 was already actionable under Massachusetts law, it remains so.

We do not adopt Doe and Bloggs's reading of section 82. The School did not violate either section 82 or <u>Tinker</u> in suspending Doe and Bloggs for their speech and conduct.

**III.**

<u>Affirmed</u>.